IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2017 Term

**FILED**

**October 6, 2017**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 16-0793

BLUESTEM BRANDS, INC. d/b/a Fingerhut,
Third-Party Defendant Below, Petitioner

v.

DARLENE SHADE,
Third-Party Plaintiff Below, Respondent

Appeal from the Circuit Court of Berkeley County, West Virginia
The Honorable Gray Silver, III, Judge
Civil Action No. 15-C-370

REVERSED AND REMANDED WITH DIRECTIONS

Submitted:  September 19, 2017
Filed:  October 6, 2017

M. David Griffith, Jr., Esq.
Joseph K. Merical, Esq.
Thomas Combs & Spann, PLLC
Charleston, West Virginia
*and*
Aaron D. Van Oort, Esq.
Erin L. Hoffman, Esq.
Jeffrey P. Justman, Esq.
Faegre Baker Daniels LLP
Minneapolis, Minnesota
*Pro Hac Vice*
Attorneys for Petitioner

Jonathan R. Marshall, Esq.
Bailey & Glasser, LLP
Charleston, West Virginia
*and*
Andrew C. Skinner, Esq.
Skinner Law Firm
Charles Town, West Virginia
Attorneys for Respondent

JUSTICE WORKMAN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "When an appeal from an order denying a motion to dismiss and to compel arbitration is properly before this Court, our review is *de novo*."  Syl. Pt. 1, *W. Va. CVS Pharmacy, LLC v. McDowell Pharmacy, Inc.*, 238 W.Va. 465, 796 S.E.2d 574 (2017).

2.      "When a trial court is required to rule upon a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–307 (2006), the authority of the trial court is limited to determining the threshold issues of (1) whether a valid arbitration agreement exists between the parties; and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement."  Syl. Pt. 2, *State ex rel. TD Ameritrade, Inc. v. Kaufman*, 225 W.Va. 250, 692 S.E.2d 293 (2010).

3.      "A meeting of the minds of the parties is a sine qua non of all contracts."  Syl. Pt. 1, *Martin v. Ewing*, 112 W.Va. 332, 164 S.E. 859 (1932).

4.      A non-signatory to a written agreement requiring arbitration may utilize the estoppel theory to compel arbitration against an unwilling signatory when the signatory's claims make reference to, presume the existence of, or otherwise rely on the written agreement.  Such claims sufficiently arise out of and relate to the written agreement as to require arbitration.

i

WORKMAN, Justice:

This is an appeal from the July 21, 2016, order of the Circuit Court of Berkeley County denying the motion of petitioner Bluestem Brands, Inc. d/b/a Fingerhut (hereinafter "Bluestem") to compel arbitration and dismiss the third-party complaint. The circuit court found that the arbitration agreement was not binding on respondent Darlene Shade (hereinafter "Ms. Shade"), in part, because 1) Ms. Shade did not assent to arbitration given that she did not receive a copy of the most recent credit card agreement containing arbitration language; and 2) Bluestem's credit partners—and not Bluestem— were party to any potentially applicable credit agreement requiring arbitration.

Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we conclude that, although the most recent amendments to the credit agreement lack mutual assent and therefore cannot be utilized to compel arbitration of this matter, the 2010 version of the credit agreement contains a properly formed agreement to arbitration and encompasses the claims asserted by Ms. Shade. We find further that Bluestem, as a non-signatory to the agreement, may utilize the theory of equitable estoppel to compel arbitration under the agreement. Therefore, the circuit court erred in denying Bluestem's motion to compel arbitration.

## I. FACTS AND PROCEDURAL HISTORY

Bluestem, doing business as "Fingerhut," is a retailer of a variety of consumer goods by way of catalog and internet shopping channels; Bluestem partners

1

with various banks to offer credit to its customers for "Fingerhut" purchases. Ms. Shade made her first "Fingerhut" purchase in 2006. She made this purchase utilizing the credit offered to customers through Bluestem's then-credit partner, CIT Bank. Ms. Shade applied for and was approved this credit by phone. Thereafter, Ms. Shade was sent a welcome packet which included a written credit agreement entitled "CIT Bank Fingerhut Credit Account Agreement." The agreement contained no arbitration provision, but did have a "change-of-terms" provision allowing for future amendments. In 2007, the credit agreement was amended to include an arbitration agreement, along with an "opt-out" provision. This agreement was sent to her with her monthly statement and she admits receiving it. She did not opt out of the arbitration agreement and continued to use the account to make additional purchases.

In 2010, Bluestem switched credit partners to MetaBank. Ms. Shade was sent a notification of the change, along with a new credit agreement, which contained essentially the same arbitration agreement and opt-out provision. Ms. Shade likewise admits receiving this agreement. The new agreement indicated it would become effective "from the first time a transaction is posted to your account." She thereafter made thirty-four purchases.

In 2012, Bluestem changed credit partners again and sent Ms. Shade a notification that its credit partner had switched to WebBank; the notice contained an 800-number to call if she had any questions about her "Account." The notice made no

2

mention of a new credit agreement and no new agreement was included with this notice.[1]

Ms. Shade claims that she never thereafter received a new agreement, nor does Bluestem

provide any evidence that she was ever provided with this agreement. The 2012 credit

agreement was purportedly amended one additional time in 2013 and notice of the

amended agreement, which made no changes to the arbitration provision, was sent to Ms.

Shade. Ms. Shade likewise denies receiving this agreement in full and, like the 2012

agreement, Bluestem provides no proof that it was sent to her. Ms. Shade made her final

purchase, purportedly subject to the 2013 agreement, on March 20, 2013.

Shortly thereafter, Ms. Shade's account allegedly went delinquent in the

amount of $3,351.52; collection efforts were initiated by a debt collector, which filed the

instant action against her. Ms. Shade then brought a third-party complaint against

Bluestem, but none of the credit partners, alleging that the finance charges and interest

rate charged for her purchases were in violation of the West Virginia Consumer Credit

and Protection Act, West Virginia Code §§ 46A-1-101 *et seq*. Ms. Shade further alleges

that Bluestem—and not any of the various credit partners—is actually the entity

---

[1] The Notice is entitled "Important Information for Valued Customers" and states that as of July 1, 2012, Bluestem had partnered with a new credit issuer, WebBank, and that the customer's account had been transferred to WebBank. It advises that the account number will remain the same, and will not affect the customer's existing balance, future purchases or "how you use your account." It references the continuing operation of any account protection plans and notes that statements will begin to reference WebBank as of July 1. It concludes by inviting the customer to "[c]ontact us at 1-800-208-2500 if you have questions regarding your Account."

3

extending credit and is therefore participating in a "rent-a-bank scheme" whereby it evades licensure and regulation in the State.

Bluestem moved to compel arbitration and dismiss the third-party complaint, which motion was denied by the circuit court. The circuit court found that 1) Ms. Shade never received the 2012 or 2013 credit card agreement and therefore could not be compelled to arbitrate pursuant to it; and 2) Bluestem was not a party to any of the prior arbitration agreements; therefore, there was no arbitration agreement with Bluestem to be enforced.[2] This appeal followed.

## II. STANDARD OF REVIEW

This Court has held that "[w]hen an appeal from an order denying a motion to dismiss and to compel arbitration is properly before this Court, our review is *de novo*." Syl. Pt. 1, *W. Va. CVS Pharmacy, LLC v. McDowell Pharmacy, Inc.*, 238 W.Va. 465, 796 S.E.2d 574 (2017). With this standard in mind, we proceed to the parties' arguments.

---

[2] The circuit court further addressed at length Bluestem's purported contention that the catalogs received by Ms. Shade were pertinent to the formation of a valid arbitration agreement. Bluestem apparently abandons its argument regarding the catalogs, to the extent it was advanced before the circuit court. The circuit court also engaged in a discussion regarding "browsewrap" agreements. "A browsewrap agreement is a contract arising in the context of Internet commerce that is formed when one accepts it merely by browsing a website." *Citizens Telecomms. Co. of W. Va. v. Sheridan*, 239 W. Va. 67, ___, 799 S.E.2d 144, 149 (2017). However, this Court can discern no "browsewrap" agreements relevant to the instant proceeding.

4

## III. DISCUSSION

Unlike most arbitration cases recently considered by this Court, neither the circuit court nor the parties raise issues of unconscionability. Rather, the challenge to the instant arbitration agreement rests on general contract formation principles. The circuit court found, and Ms. Shade argues, that she never received the 2012 or 2013 agreements; therefore, she did not assent to arbitration and cannot be compelled to do so under those agreements. The circuit court further found, and Ms. Shade argues, that whatever prior agreement(s) may have been formed was entered into with the credit partners and not Bluestem. Therefore, Ms. Shade argues that she cannot be compelled to arbitrate her claims in this matter, which were filed exclusively against Bluestem, pursuant to those agreements.

Generally, with respect to a trial court's consideration of a motion to compel arbitration, this Court has held:

> When a trial court is required to rule upon a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–307 (2006), the authority of the trial court is limited to determining the threshold issues of (1) whether a valid arbitration agreement exists between the parties; and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement.

Syl. Pt. 2, *State ex rel. TD Ameritrade, Inc. v. Kaufman*, 225 W.Va. 250, 692 S.E.2d 293 (2010). With this framework in mind, we examine the circuit court's refusal to compel arbitration.

5

*A.    Existence of a Valid Agreement*

The United States Supreme Court has explained that "arbitration is simply a matter of contract between the parties; it is a way to resolve disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).  Therefore, an agreement to arbitrate must contain the elements required for proper formation of any contract. Inasmuch as our analysis requires us to first determine if any arbitration agreement which may potentially govern this matter was legally formed, we will examine each potentially applicable agreement.

Ms. Shade does not dispute receiving the 2007 and 2010 credit agreements, both of which contained an arbitration provision, along with an "opt-out" provision. Both agreements contain largely similar language requiring arbitration.  The arbitration provision in the 2010 agreement provides that

> [a]ny claim, dispute or controversy (whether in contract, regulatory, tort or otherwise, whether pre-existing, present or future and including constitutional, statutory, common law, intentional tort and equitable claims) arising from or relating to the credit offered or provided to you, the actions of yourself, us, or third parties; or the validity of this Arbitration provision . . . must, after an election by you or us, be resolved by binding arbitration[.]

The 2010 agreement further contains a notice in bold lettering in a box at the beginning of the agreement stating:  "Arbitration notice:  This Agreement provides that all disputes arising from or related to your Account may be resolved by arbitration.  See 'Arbitration'

6

below." Moreover, the 2010 agreement provides that it becomes operable upon first use: "You . . . will be bound by this Agreement from the first time you use the Account." Ms. Shade made forty-one purchases following receipt of the 2010 agreement.

Therefore, it appears clear that the 2007 and 2010 credit agreements contained express arbitration provisions of which Ms. Shade had notice and an opportunity to decline. Ms. Shade's continued use of the credit after receiving the 2007 and 2010 credit agreements containing the arbitration agreements, per the language of the agreement and as held by this Court, plainly constitutes mutual assent. As this Court has explained:

> West Virginia contract law requires mutual assent to form a valid contract. . . . "'In order for this mutuality to exist, it is necessary that there be a proposal or offer on the part of one party and an acceptance on the part of the other. Both the offer and acceptance may be by *word, act or conduct that evince the intention of the parties to contract. . . .*'"

*New v. GameStop, Inc.*, 232 W.Va. 564, 572-73, 753 S.E.2d 62, 70-71 (2013) (emphasis added) (quoting *Ways v. Imation Enters. Corp.*, 214 W.Va. 305, 313, 589 S.E.2d 36, 44 (2003)); *see also Citizens Telecomms.*, 239 W. Va. at ___, 799 S.E.2d at 149 (discussing mutual assent and modification of unilateral contracts; noting that acceptance of contractual terms and conditions occurred through "continued use" of the service); *First Nat. Bank of Gallipolis v. Marietta Mfg. Co.*, 151 W.Va. 636, 641-42, 153 S.E.2d 172, 176 (1967) ("That an acceptance may be effected by silence accompanied by an act of the offeree which constitutes a performance of that requested by the offeror is well

7

established."). Accordingly, both agreements were properly formed and, upon acceptance of the terms of the 2010 agreement, it became the agreement governing Ms. Shade's use of the credit provided thereunder. [3]

The 2012 and 2013 agreements, however, present an entirely different factual scenario. Ms. Shade contends that she never received either of these agreements and Bluestem provides no evidence that Ms. Shade was ever sent a copy of these agreements. Instead, Bluestem claims the 2012 and 2013 purported amendments to the 2010 credit agreement were properly made through provision of a "notice" of the change of credit provider. Citing West Virginia Code § 46A-3-116(2) (1994), Bluestem maintains that the credit agreement may be unilaterally amended with simple written notice and that actual provision of the agreement is not necessary:

> A creditor may change the terms of a revolving charge account or revolving loan account whether or not the change is authorized by prior agreement. The creditor shall give to the consumer written notice of such change not less than fifteen days prior to the effective date of such change.

_____

[3] Not surprisingly then—albeit belatedly—in a responsive supplement recently provided to the Court, Ms. Shade expressly concedes that the 2007 and 2010 agreements were "legally formed" but merely maintains that such agreements were not entered into with Bluestem. In this supplement, she also launches several previously undeveloped challenges to the 2010 agreement's applicability to this action, despite conceding in her initial brief that "there is no dispute in this case regarding 'the scope of arbitrable issues.'" These newly-formed challenges to the scope of the arbitration language are addressed more fully *infra*.

The circuit court found, and Ms. Shade argues, that the lack of receipt of this purported modification in this instance is fatal to mutual assent to arbitrate under the 2012 and 2013 agreements.[4] We agree.

Bluestem appears to take the tenuous position that insofar as the "notice" provision contained in West Virginia Code § 46A-3-116(2) is satisfied, mutual assent is established. Bluestem's argument is unavailing. While the statute does in fact allow for unilateral modification of a revolving charge account with written notice to the consumer, implicit in this notice requirement is the necessity of providing the consumer with the modifications, so as to establish mutual assent. The statute cannot be read to obviate the necessity of this element of contract formation. Bluestem's notice indicates merely that there was a change in credit partners. It makes no reference whatsoever to the existence of a new credit agreement.

To overcome this inadequacy, Bluestem cites a litany of cases which it claims stand for the proposition that its "notice," *along with* the availability of an 800-number for questions regarding Ms. Shade's "[a]ccount" were sufficient to establish mutual assent to a subsequent amendment to the 2010 agreement. Bluestem argues that had Ms. Shade desired to obtain the new credit agreement, she need only have availed

---

[4] The circuit court also found that the credit agreements were illusory simply because they were unilaterally amended several times. We find this conclusion erroneous and note the circuit court's apparent failure to consider West Virginia Code § 46A-3-116(2), which expressly permits amendment of revolving charge account agreements.

9

herself of the 800-number to request it. However, in all of the cases cited by Bluestem, the subsequent amendment at issue was either provided to the consumer or was sufficiently described such as to put the consumer on notice regarding the *substance* of the amendment and that further information regarding the amendment could be obtained by following the instructions given. *See, e.g., Cicle v. Chase Bank USA*, 583 F.3d 549, 551, 554 (8th Cir. 2009) ("Chase sent Cicle a new arbitration agreement that replaced the one previously in effect" and "[t]he notice [of amendment to cardholder agreement] specifically stated in the 'Summary of Changes' section that the arbitration agreement was being amended and suggested that the cardholder review the changes."); *Ackerberg v. Citicorp USA, Inc.*, 898 F. Supp. 2d 1172, 1174 (N.D. Cal. 2012) ("Citibank notified plaintiff that it would be modifying the terms of all former Sears accounts. The modifications would include changes to, *inter alia*, the arbitration clause and the governing law." (citations omitted)); *Guerrero v. Equifax Credit Info. Servs., Inc.*, No. CV 11-6555, 2012 WL 7683512, at *3 (C.D. Cal. Feb. 24, 2012) ("Citibank mailed its cardmembers, including Plaintiff, a 'notice of Change in Terms regarding Binding Arbitration to Your Citibank Card Agreement[.]' . . . The 2001 Change–in–Terms was mailed to Plaintiff with his October 2001 billing statement, along with an express directive to 'please see the enclosed change in terms notice for important information about the binding arbitration provision we are adding to your Citibank card agreement.'"); *Daugherty v. Experian Info. Sols., Inc.*, 847 F. Supp. 2d 1189, 1191 (N.D. Cal. 2012) ("Sears changed the terms of Plaintiff's credit card account by mailing him

new credit card agreements. Each of these agreements contained a change of terms provision, an arbitration provision, and an assignment provision." (citations omitted)).

None of the cited cases found that a subsequent amendment was valid where the consumer was neither 1) provided with the amendment, nor 2) provided with sufficient notice of the *substance* of the amendment and opportunity to obtain additional information and/or the actual amendment. Bluestem's notice that it was changing credit partners fails to even suggest that there is a new agreement to obtain. In fact, Bluestem's notice reads in such a way as to reassure the consumer that *nothing* has changed despite the switch in credit partners: "Your account number will remain the same. In addition, this change will not affect your existing balance, future purchases or how you use your account." It is self-evident that a party cannot assent to a change of which it is unaware. "A meeting of the minds of the parties is a sine qua non of all contracts." Syl. Pt. 1, *Martin v. Ewing*, 112 W.Va. 332, 164 S.E. 859 (1932).

This precise issue was recently addressed in a case involving Bluestem and these same credit agreements in the Minnesota District Court. In *Parm v. Bluestem Brands, Inc.*, Civil Nos. 15-3437 and 16-624, 2017 WL 1193993, at *7 (March 30, 2017, D. Minn.), *appeal filed*, No. 17-1931 and -1932, (8th Cir. May 2, 2017), the District Court found that the lack of adequate notice of the new agreement and arbitration provision made the 2012 agreement invalid: "Parm and Bowers received no notice of updates to the 2010 Agreement other than those specifically mentioned in mailings. The

11

Banks therefore did not effectively modify the 2010 Agreement or the arbitration provision therein[.]" We agree with the *Parm* court and find that Ms. Shade cannot be bound by the terms of the 2012 or 2013 arbitration agreements since the attempted amendments of the credit agreement were invalid.

However, notwithstanding the ineffective modification attempted by the 2012 and 2013 agreements, it is clear that the validly formed 2010 credit agreement and attendant arbitration provision continued to be in effect and governed Ms. Shade's use of the credit. Simply because the 2012 and 2013 amendments were ineffective does not render the pre-existing credit agreement nonexistent. The *Parm* court came to the same conclusion: "The Banks therefore did not effectively modify the 2010 Agreement or the arbitration provision therein, and [t]he arbitration provision in the 2010 Agreement, as opposed to a later version of the Credit Agreement, is binding on Parm and Bowers." *Id*.

Accordingly, Ms. Shade is subject to the arbitration agreement contained in the most recent agreement to which she assented—the 2010 agreement.[5] Quite simply,

---

[5] As previously noted, in a supplement provided to the Court, Ms. Shade launches a more substantive defense to the applicability of the 2010 agreement, seemingly recognizing—albeit belatedly—the potential to be bound by the 2010 agreement. Therein, Ms. Shade takes the position that the 2010 agreement "did not apply *at the time the underlying conduct occurred* in any event[.]" (emphasis added). However, the briefing scarcely mentions, much less fully develops, this issue. "It is . . . well settled . . . that casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal." *State v. Lilly*, 194 W.Va. 595, 605 n.16, 461 S.E.2d 101, 111 n.16 (1995) (quoting *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993)). Ms. Shade's defense to the 2007 and 2010 agreements can be fairly said to be limited to the issue of (continued . . .)

Ms. Shade agreed to arbitrate claims arising from the use of the credit provided for "Fingerhut" purchases; a dispute about which particular agreement is binding does not extinguish her unequivocal agreement to arbitrate any such claims. *See EEC, Inc. v. Baker Hughes Oilfield Operations, Inc*., 460 F. App'x 731, 735 (10th Cir. 2012) (finding that multiple documents "unambiguously reflect[ing] the parties' intent" to arbitrate required arbitration, irrespective of which particular agreement controlled).

## B.      *Enforcement of Arbitration Agreement by Bluestem*

Having determined that the 2010 credit agreement was validly formed and continued to govern Ms. Shade's use of the credit, the remaining question is whether Bluestem may enforce the arbitration provisions contained therein. Ms. Shade argues that the credit agreements were with the credit partners,[6] rather than Bluestem. Therefore, she argues that Bluestem cannot enforce the arbitration agreement.

---

Bluestem being a non-signatory to the agreement. She did not advance a time-based defense to applicability of those agreements.

Nevertheless, we note that Ms. Shade's complaint itself belies her contention that the complained-of conduct is limited to a particular period of time not encompassed by the 2010 agreement, particularly since we have determined that such agreement continued in effect throughout the duration of her relationship with Bluestem. She alleges that the excessive interest was levied "every month" and late fees were charged "after her first and all subsequent late payments," respectively.

[6] Once again, in a supplement to the Court, Ms. Shade develops yet another new argument focused on the 2010 agreement, suggesting that since that agreement involved a credit partner other than WebBank—against whom she directs her "rent-a-bank" allegations—it is inapplicable to the current dispute. This is but a different facet of the similarly undeveloped argument described in n.5 *supra*. This Court has made clear that (continued . . .)

13

However, "[w]ell-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416-17 (4th Cir. 2000). This Court recently addressed enforcement of arbitration agreements relative to non-signatories in *Chesapeake Appalachia, L.L.C. v. Hickman*, 236 W.Va. 421, 781 S.E.2d 198 (2015). In *Chesapeake Appalachia*, however, the issue involved a signatory's attempt to enforce arbitration *against* a non-signatory and we therefore issued a syllabus point articulating five theories under which a non-signatory may be so compelled. *See* Syl. Pt. 10, *Id.* ("A signatory to an arbitration agreement cannot require a non-signatory to arbitrate unless the non-signatory is bound under some traditional theory of contract and agency law. The five traditional theories under which a signatory to an arbitration agreement may bind a

---

"'[a] skeletal "argument," really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs.'" *State, Dept. of Health v. Robert Morris N.*, 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995), (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)). Furthermore, "[a]lthough we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal." *State v. LaRock*, 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996).

Nevertheless, our analysis of the non-signatory issue effectively resolves this argument. Ms. Shade unequivocally agreed to arbitrate disputes arising from her use of the credit provided for "Fingerhut" purchases and she expressly chose *not* to name WebBank as a defendant. As discussed *infra*, her claims plainly arise from and relate to the credit agreement she seeks to disavow. Any attempt to engineer her pleadings to evade that agreement is rendered unsuccessful by virtue of the estoppel theory.

14

non-signatory are: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.").

Although *Chesapeake Appalachia* dealt with the converse of the factual scenario in this case, we nevertheless acknowledged the estoppel theory of arbitration enforcement by a non-signatory: "[A] willing non-signatory seeking to arbitrate with a signatory that is unwilling may do so under what has been called an alternative estoppel theory, which takes into consideration the relationships of persons, wrongs and issues." *Id.* at 440, 781 S.E.2d at 217 (quoting *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003)). *See Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995) (observing courts have widely held "parties [are] estopped from avoiding arbitration [where] they ha[ve] entered into written arbitration agreements, albeit with the affiliates of those parties asserting the arbitration and not the parties themselves.").

The Fourth Circuit has elaborated on the concept, setting forth a test for application of the estoppel theory of arbitration enforcement by a non-signatory, as follows:

> [E]stoppel applies when the signatory to a written agreement containing an arbitration clause must *rely on the terms* of the . . . agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory *makes reference to or presumes the existence of the written agreement*, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.

15

*Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006) (quoting *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 395–96 (4th Cir. 2005)) (emphasis added). Accordingly, we hold that a non-signatory to a written agreement requiring arbitration may utilize the estoppel theory to compel arbitration against an unwilling signatory when the signatory's claims make reference to, presume the existence of, or otherwise rely on the written agreement. Such claims sufficiently arise out of and relate to the written agreement as to require arbitration.

Therefore, Ms. Shade's argument that she may not be compelled to arbitrate simply because Bluestem was not a signatory to the credit agreement necessitates further analysis. The Court must view Ms. Shade's allegations against Bluestem to determine whether they reference, presume the existence of, or otherwise rely on the 2010 credit agreement. In her recent supplement, Ms. Shade attempts to utilize the *Parm* case to argue that the arbitration agreement does not reach her claims; however, *Parm* fully supports a requirement to arbitrate.

Consistent with the estoppel rule articulated hereinabove, the *Parm* court found that, despite the arbitration agreement's language that "any and all disputes" were subject to arbitration, only those that "'aris[e] out of or relat[e] to'" the agreement or relationship with WebBank were arbitrable. 2017 WL 1193993 at *11. Accordingly, the *Parm* court found that allegations regarding Bluestem's pricing of goods were not subject

16

to arbitration, as such allegations did not pertain or relate to the extension of credit. *Id.* However, the court expressly found that allegations regarding interest rates and finance charges were specifically governed by the arbitration agreement. *Id.* at *11-12. We likewise find that Ms. Shade's allegations pursuant to the West Virginia Consumer Credit and Protection Act for unlawful late fees and usurious interest rates pertain *exclusively* to charges arising pursuant to the credit provided to her, thereby permitting the use of estoppel to compel arbitration of these claims.

As to her "rent-a-bank scheme" allegations, Ms. Shade alleges the existence and operation of a deceptive scheme being perpetrated by Bluestem utilizing WebBank as a "front" for its own creditor activity. She argues that because she has leveled these claims only against Bluestem and contends that Bluestem is the "real" credit lender—disavowing any involvement with the credit partners—such allegations could not possibly "arise out of" any agreement with the credit partners. We find this contention to be disingenuous.

Although Ms. Shade may not be trying to "prove" any of the credit agreement's terms, the existence of the credit purportedly extended under the agreement is the necessary underpinning of her "rent-a-bank" allegations. Without the credit agreement—which provided for the fees and interest rates she now complains of and sets the stage for the relationships and "scheme" she alleges—she would have no cause of action. *See Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 382 (5th Cir. 2008)

17

("Sherer has agreed to arbitrate any claims arising from 'the relationships which result from th[e] [a]greement.' A loan servicer, such as Green Tree, is just such a 'relationship.' Indeed, without the Loan Agreement, there would be no loan for Green Tree to service[.] . . . Sherer's FDCPA and FCRA claims arise from Green Tree's conduct as Sherer's loan servicer and, therefore, fall within the terms of the Loan Agreement's arbitration clause.").

Accordingly, pursuant to the estoppel method of arbitration enforcement, because her claims are necessarily predicated upon the existence of the credit utilized in her relationship with Bluestem, Ms. Shade may be properly compelled to arbitrate her claims against it. Therefore, we conclude that the circuit court erred in denying Bluestem's motion to compel arbitration.[7]

---

[7] In view of our resolution of this matter, we find it unnecessary to address the issues raised by Bluestem following oral argument regarding the delegation of issues of arbitrability.

However, we take this opportunity to note that the parties to this matter collectively provided no less than six letters after this appeal was perfected, ostensibly as "notice of additional authorities" pursuant to Rule 10(i) of the West Virginia Rules of Appellate Procedure. While certain of the communications pertained to cases recently issued, we would be remiss if we did not note the unacceptable use of this procedural mechanism to augment and/or develop arguments inadequately presented in the original briefing. *See* n.3, 5, and 6, *supra*. We caution counsel that supplementation under Rule 10(i) is not to be utilized for otherwise impermissible responsive argument or raising and/or developing new arguments or issues.

## IV.  CONCLUSION

For the reasons set forth hereinabove, we reverse the July 21, 2016, order of the Circuit Court of Berkeley County, West Virginia, and remand this matter for entry of an order dismissing the action and compelling arbitration.

Reversed and remanded with directions.