# WHEELING.

McKell et ux. v. Collins Colliery Co.

Submitted February 8, 1899—Decided June 17, 1899.

| 46 | 625 |
| 48 | 314 |

| 46 | 625 |
| 654 | 595 |

1. EQUITY PLEADING—*Depositions—Exceptions to Bill.*

When a bill in chancery for injunction against a defendant corporation was taken for confessed, and set for hearing at September rules, 1896, and at May rules, 1897, the defendant filed its answer in the cause, signed by its corporate name by its attorney, and from that time until September 28, 1897, the plaintiff and defendant took depositions to sustain their respective pleadings, and the cause was thus fully prepared for hearing on its merits, it is not error for the circuit court to overrule exceptions filed to said answer on said 28th day of September, 1897, because same was not properly filed, and because it was not properly attested. (p. 632).

2. EQUITY PLEADING—*Waiver.*

In such case the plaintiff will be held to have waived his right to except to such answer for the want of proper filing and attestation, and the cause comes within the purview of section 4, chapter 134, Code. (p. 632).

3. LEASE—*Reservation—Right of Way.*

When the grantor reserves in a coal lease "the right of way for any railroads or wagon-roads that may be required for the further development of any of the property of the lessor" over and through the leased premises, and in the lease it is provided that "the buildings and other improvements to be erected by the lessee shall be so located and constructed as to preserve proper and convenient entries to and from the C. & O. Ry. Co., or other railroad company's, tracks, to which the lessors may grant permission through, over, and across said track,—the location of such railroad, if reasonably convenient, to be determined before said improvements are erected,"—the selection of the route is for the owner of the way; but he cannot make it an unreasonable place, when it would cause unnecessary injury to the lessee. (p. 633.)

4. EQUITY PLEADING—*Evidence—Right of Way—Obstructions.*

In a suit to enjoin the lessee from obstructing by such buildings and improvements a right of way selected by the grantor, which the lessee claims is unreasonable and unnecessarily injurious to its operations, it is competent for the lessee to offer evidence in support of other and alternative ways or routes. (p. 634.)

5. DEPOSITIONS—*Permission of Court.*
    It is a general rule that a deposition once taken cannot be re-
    taken without the leave of the court, which will always be granted
    whenever justice seems to require it.  *Carter* v. *Edwards,* 80 Va.,
    58.  (p. 634).

6. EQUITY PLEADING—*Depositions.*
    When a deposition not excepted to has been retaken without
    leave of the court, it may or may not be read, at the discretion of
    the court.  (p. 634.)

Error to Circuit Court, Fayette County.

Bill by Thomas G. McKell and wife against the Collins
Colliery Company.  Decree for defendant, and plaintiffs
bring error.

.                        *Affirmed.*

PAYNE & PAYNE and BROWN, JACKSON & KNIGHT, for
plaintiff in error.

C. W. DILLON, for defendant in error.

McWHORTER, JUDGE:

On the 15th day of June, 1893, Thomas G. McKell and
Jean D. McKell, his wife, leased to the Collins Colliery
Company, a corporation, for the period of twenty-five
years from said date, for coal-mining and coal-coking pur-
poses only, a tract of one thousand, thirty-six acres.
of land in Fayette and Raleigh counties.  Said lease
contains the following reservations:  "Also, the
right of way for any railroads or wagon roads that may
be required for the further development of any of the
property of the lessors is excepted and reserved by lessors,.
and proper right of air courses from and to adjoining lands.
are also reserved, to be located by engineer of the lessors.
This right used is to be restricted or exercised only on the
written recommendation of the engineer or agent of the
lessors."  And it further contains the following provision:
"Second.  The lessee shall have the sole and exclusive priv-
ilege of mining and coking from the said Sewell or upper
seam of coal on the above-described premises during the
continuance of this lease, and the privilege of using so
much of the surface of the land and such of the timber as.
has been above set apart by lessors for use of this lease;
also, so much stone, sand, and water thereon as may be
necessary for its mining, coking, and building purposes on
said premises, but for no other purpose; and it is further

agreed that the buildings and other improvements to be erected by the lessee shall be so located and constructed as to preserve proper and convenient entries to and from the Chesapeake & Ohio Railway Company, or other railroad company's, tracks, to which the lessors may grant permission through, over, and across the said tract,—the location of such railroad, if reasonably convenient, to be determined before said improvements are erected." At the August rules, 1896, the said McKells filed their bill in the circuit court of Fayette County against the Collins Colliery Company, reciting and exhibiting said lease, and alleged that, by the terms and stipulations contained in said lease, they had the absolute right to build through and over said leased premises wagonroads, tramroads, railroads. or any other line of transportation, from the tracks of the Chesapeake & Ohio Railway Company to the lands of plaintiffs lying back of and remote from the said railway tracks, for the further development of their property; that no obstructions were to be placed by said defendants in the way of said rights of way so reserved, but that its buildings and improvements were to be so erected as not to in any manner interfere with the free use of said rights of way by plaintiffs; that said plaintiffs owned valuable coal and timber lands adjacent to the leasehold of defendant, and were anxious to develop it, but in order to do so it would be necessary to construct a railroad through the premises of defendant, and that there was but one practicable route for said road, which route was fully described and designated in a plat and notice filed as an exhibit with the bill; that, in pursuance of said lease and reservations therein contained, they staked out and surveyed the line of railroad designated in said exhibit, and sought to build the same through the premises leased, in a manner that would in no way interfere with defendant in the full enjoyment of the privileges granted in said lease; that the particular formation of the land through which said railroad was sought to be constructed was such that no other available way could be had; that defendant had full knowledge and adequate notice of plaintiffs' intention and preparation for building said road, yet defendant, totally disregarding plaintiffs' rights reserved in said lease, and flatly ignoring said notices, began building, without consent of plaintiffs,

and within the line of said proposed railroad designated in said exhibit, additional buildings to its storehouse, which addition obstructed and prevented plaintiffs in building and constructing said railroad; that said additional buildings were placed where they were for the purpose of obstructing plaintiffs in the construction of their said railroad, and could have been placed in as convenient location on the east end of said store building instead of on the west end, and, if placed on the east end, would not have interfered with plaintiffs proposed railroad, but, as they were, would permanently interfere with plaintiffs in the construction of same, and prevent them from developing their property; that the damage from said obstruction would be irreparable, as they would permanently prevent the construction of the proposed railroad on the only practicable location; and that such damage could not be adequately compensated by a recovery in a suit for damages,—and prayed that inasmuch as they were without relief except in equity, and to avoid a multiplicity of suits, defendant, its agents, and employes, be enjoined and inhibited from any longer obstructing the said line of railroad by the said building, or in any way whatever from placing further obstructions on said line; and that defendant, its agents or employes, be required, as soon as possible, to remove any and all obstructions placed by them thereon, from off the said right of way; and for general relief. At the May rules, 1897, the defendant filed its demurrer and answer to said bill: Admitting the lease, and its possession of the premises thereunder. Averring that plaintiffs had wholly failed to comply with the conditions of said reservation in said lease, and denying plaintiffs' right, under such general reservation, to build a raiload or wagonroad over the said leased premises, unless the same should be located and used in a way that would not interfere with and defeat the object and purpose of the lease. Averring that, after plaintiffs had executed said lease, respondent laid out at large expense (at a cost of one hundred and forty thousand dollars) a coal plant, consisting of coke ovens, coal tipples, side tracks, engine house, stables, tenement houses, store house, and offices, all necessary for the successful operation of the coal business and carrying out the provisions of said lease; that the openings of the coal in the said lands were

made on either side of Crooked Run branch, the only practicable place for said openings upon the land; that a large, expensive, double tipple had been erected across the said branch or hollow, connecting the two openings to the coal; that the side tracks upon which the railroad cars stood to be loaded from the said tipple extended under the said tipple, in the center of said branch, and along up the said valley, for several hundred feet; that defendant transported over said side tracks coal produced from said lands amounting to about two hundred and fifty tons per annum, for which it paid plaintiffs royalties amounting to about twenty-five thousand dollars per annum; that said branch over which said tipples were built was very narrow (just sufficient space for defendant's side tracks and other appliances for the proper loading and handling of the coal so produced); that said coal plant and improvements were located and built upon a point on said land known to plaintiffs to be the only suitable place for the successful operation of a coal mine upon said land, and that portion of said land where the said coal plant was located was included in said lease because it was specifically suited for the improvements, and no other practicable location could be found upon the said lands, and that said improvements were built long prior to the institution of this suit, and prior to any contemplated road by plaintiffs at that point, and that the coal plant and the improvements were located with the knowledge and consent of plaintiffs. Denying that it ever had any notice or knowledge of the intention of plaintiffs to construct a road of any kind where it was proposed to construct it until the written notice of May 23, 1896, filed as exhibit with the bill, at which time the obstruction complained of had been completed, and in occupancy by defendant. Denying that it ever intentionally obstructed the right of way claimed by plaintiffs. Denying that the location of the road as alleged in the bill was the only practicable location, but, on the contrary, averring that there were several other locations to be had on better grade, cheaper to build, and perfectly practicable and feasible, three of which had been surveyed, mapped, and profiled,—one by Oscar A. Veazey, plaintiffs' engineer, a map and profile of which was exhibited with the answer; two others by Herman Garner, civil engineer, maps and profiles of which

were also exhibited (the last two showing two alternative routes designated on said maps),—either of which said locations would not materially interfere with defendant's coal plant. Averring that the location of the right of way as claimed by plaintiffs crosses defendant's side tracks, runs under the tipples, through the stable lots, and through defendant's store house, and practically takes defendant's wagon road and only convenient thoroughfare leading from its store to the railway depot, the use of which location by plaintiffs as claimed in their bill would practically defeat the object of the said lease, subject the defendant and the employes to continued annoyance and danger, and bring irreparable loss and damage to defendant. The said answer says that defendant has at no time offered any resistance to plaintiffs in the due exercise of their rights under the said provisions of said lease, and has no objections whatever to plaintiffs having a right of way for a railroad, wagonroad, or any other road, provided they located said road where it would not materially damage and interfere with defendant in the proper use of its said coal mine. Respondent further says that the object of said roadway contended for by plaintiffs is supposed to be for the purpose of taking out timber, and that the timber which is supposed to be handled over the said roadway respondent had offered to buy of plaintiffs at the market price, but that the offer had been refused by plaintiffs. Respondent further says that the prime object of plaintiffs in contending for the right of way upon the location demanded by them is to annoy and injure defendant on account of other differences and disagreements between plaintiffs and defendant, which arose previous to the institution of this suit, and that their demand in this suit is not a *bona fide* claim, but a subterfuge for the purpose of injuring defendant; and, having fully answered, etc. Depositions were taken and filed in the cause by both plaintiffs and defendant.

On the 28th day of September, 1897, the plaintiffs tendered exceptions to defendant's answer on the following grounds: (1) Because the same was not properly filed; (2) because the same was not properly attested; (3) because the same was not responsive to the bill; and (4 )because the same was not sufficient in law,—and for the said reasons moved the court to strike out said answer from the pa-

pers in the cause, which exceptions were ordered filed, when the court, on consideration of the defendant's demurrer to, the bill and said exceptions to the answer, overruled the demurrer to plaintiffs' bill and the demurrer to defendant's answer, and each and every exception thereto, and also plaintiffs' motion to strike out said answer from the file in said cause, and plaintiffs replied generally to said answer, and the cause was heard on the 1st day of October, 1897, upon plaintiffs' bill and exhibits, defendant's answer and replication thereto, the depositions of witnesses, and exceptions thereto, and arguments of counsel. The court overruled defendant's exception to the deposition of T. G. McKell, and sustained its exceptions to the second depositions of J. J. Robinson and Thomas Nichol, so far as the same were not in rebuttal to the defendant's depositions, and refused to grant the injunction prayed for, and dismissed plaintiffs' bill and gave defendant judgment for costs, from which decree plaintiffs appeal to this court, and say that it was error to allow the answer of defendant to be read, because the same was neither properly filed, attested, nor responsive to the bill; that it was error to allow the defendant to offer any evidence in support of an alternative route, to strike the second deposition of J. J. Robinson and Thomas Nichol from the record, and to refuse to consider the same, and to deny the plaintiffs the rights reserved in said deed of lease, and to dismiss their bill by the decree of October 1, 1897, without granting them the relief prayed for.

As to the first assignment, the answer of defendant was filed the 1st of May, 1897,—as early as May rules, which are held the first Monday. While it is contended by appellees that it was properly filed at rules, under section 5, chapter 125, Code, the cause had been matured before that time, and was no longer at the rules, yet the answer was filed in the cause, and appellants nowhere claim that they had no notice of the filing of the answer, but both parties went on taking depositions in support of their bill and the answer, respectively, for nearly five months after the filing of the answer, and the cause was prepared for hearing on its merits before exception was taken to said answer for any cause. In *Hayzlett* v. *McMillan*, 11 W. Va. 464, it is held: "Generally an answer to a bill in equity can

only be filed during the session of the court, or at the rules, but by our statute an exception is made in cases of injunction. The larger power to entertain and decide the motion to dissolve embraces that of receiving the answer, and also replication thereto, and making them a part of the record." *Goddin* v. *Vaughan's Ex'x*, 14 Grat. 102, 130. In the case at bar no injunction had been granted. The contest was upon the application in the bill for an injunction. The bill did not require a sworn answer. Technically, the answer should have been signed by the president, with the seal of the company affixed. *Teter* v. *Railroad Co.*, 35 W. Va. 433, (14 S. E. 146). But plaintiffs raised no objection thereto during the five months the parties were preparing the case on the bill and answer by taking their proofs, and, as stated in appellant's petition for appeal, "no temporary injunction was asked, but by mutual consent the matter was heard on its merits." Under the circumstances of this case, if the court had sustained the exception to the answer, it must, to do justice to the cause, have permitted defendant to file its answer, when the discarded paper would have received the signature of the president and the seal of the company, and again been tendered as the answer of the defendant. If plaintiffs intended to rely upon the insufficiency of the answer and its filing, why did they delay their objections and exceptions thereto until the cause was prepared by the taking of testimony for hearing? Appellants say that the answer was "no answer," and therefore the case did not come within the purvew of section 4, chapter 134, Code, as "the absence of a necessary pleading does not constitute a mere informality in the proceedings, and is not cured by a hearing on the merits"; that "without an answer the bill stood taken for confessed, and defendant was not entitled to read its depositions, and the decree of the court below should have been granted, and the decree of this Court should grant the prayer of plaintiffs' bill." If this is true, why did not plaintiffs file their exceptions to the answer as soon as it was filed, and ask for the decree to which they were entitled on the bill taken for confessed? Why the labor and expense and waste of time in taking proofs which were unnecessary on behalf of plaintiffs, and which could not be properly read on behalf of defendant? It is claimed the answer is not responsive to the bill, and

therefore is not sufficient. The answer denies the material allegations of the bill; denies specifically that no other available way than the one laid out by plaintiffs could be had, and that the line of railroad sought to be built by plaintiffs through the leased premises would in no way interfere with the defendant in the full enjoyment of the privileges granted it in said lease, but, on the contrary, avers that the building of said road on said location would practicaly defeat the object of the lease, and subject defendant and its employes to continued annoyance and danger and bring irreparable loss and damage to the defendant; and designates several other routes or ways, as convenient and as cheap to plaintiffs, which could be used without interfering materially with the operations of defendant in the proper use of its premises. The defendant had taken a lease for the purpose of developing the coal interests of plaintiffs, and for removing the coal at a profit to itself; it had invested a large amount of money in preparations for its operations, and was paying a royalty on the products of its works ,to the plaintiffs, of about twenty-five thousand dollars per annum; and it had the right to the unrestricted use of the premises for the purposes of its business, subject to the reservation by plaintiffs of a right of way over the premises, but the right of way was not located. Such right of way might be fixed by the parties, and, when once so fixed, could not be changed, and, not being so fixed, "the selection of the route is for the owner of the way, but he cannot make it at an unreasonable place, when it would cause unnecessary injury to the servient tenant." 2 Wait, Act. & Def. 673. "When one has an easement in another's land, he must be allowed to enjoy it in such a manner as will secure to him all the advantages contemplated by the grant, but he must so use his own privileges as not to do any unnecessary injury to the grantee." *Dixon* v. *Clow*, 24 Wend. 188, 190; *Bissell* v. *Grant*, 35 Conn. 288; Russell v. Jackson, 2 Pick. 574. Appellant contends that the grantor reserving a right of way must use his own judgment fairly in laying out of the way, and, if he does this, may do so unrestrictedly, unless restricted by the terms of the lease, as held in *Hart* v. *Conner*, 25 Conn. 331. Whether plaintiffs have used "their own judgment fairly in laying out the way" is the question for determination in this suit. If it

is found, as the plaintiffs contend, that they have so used their judgment, then their action should be sustained; but if, on the other hand, it is found that they have arbitrarily exercised their reserved rights, to the great damage and danger to the interests of the lessee, they should be restrained in such arbitrary and unreasonable exercise of rights reserved to them. Appellee's contention is, and it undertakes to show by proofs, that the route chosen by appellants would greatly damage and endanger its operations under the lease, and it undertakes to point out other routes, as convenient and as cheap to appellants which would not interfere with or damage its works; and I am unable to see why it should not be permitted to show this. If not, appellants might so exercise their "reserved rights" as to drive appellee from its lease, or quite destroy its business.

The second assignment is that it was error to allow defendant to offer any evidence in support of an alternative route. This was the main question in controversy. It is conceded that plaintiffs had the right of way by the reservation. Law and equity say that it shall be so located as to be convenient to plaintiffs, but at the same time not to unnecessarily injure their lessee. Plaintiffs allege that the way chosen by them is the only available route, and will in no way interfere with defendant in its operations, while this is denied, and defendant undertakes to show there are other routes equally as convenient to plaintiffs, and that will not interfere with its operations, while plaintiffs' route would probably prove disastrous to it; and it is competent to show these facts by proof.

The third assignment is that it was error to strike the second depositions of witnesses Robinson and Nichol from the record, and refuse to consider them. These depositions were stricken out so far only as they were not in rebuttal of defendant's depositions. The depositions of these witnesses had been regularly taken before, and filed in the cause, and read at the hearing. They were retaken without leave of the court, and it seems to be well settled that it is discretionary with the court whether such depositions shall be read. It is true, in the case of *Fox* v. *Jones*, 1 W. Va. 205, it is held that "when a deposition has been taken in a cause, and excepted to, it may be retaken by the party desiring to use it, before the cause is heard, without

an order from court for that purpose"; but in case at bar the first depositions were not excepted to.   In *Hall* v. *Pegram*, 85 Ala. 522, (5 S. E. 209,) and (6 S. E. 612), it is held that "the re-examination of a witness in a chancery cause is matter of discretion with the chancellor, and this court cannot review the exercise of that discretion."   So in *Heser* v. *Lumpkin*, 4 Ala. 509, and in *Carter* v. *Edmonds*, 80 Va. 56.   "It is a general rule that a deposition once taken cannot be retaken without the leave of the court, which will always be granted whenever justice seems to require it."   *Fant* v. *Miller*, 11 Grat. 187; *Van Hook* v. *Pendleton*, 2 Blatchf. 85, Fed. Cas. No. 16,852; *Booth* v. *McJilton*, 82 Va. 827.

The fourth assignment, that "it was error to deny the plaintiffs the rights reserved in said deed of lease, and to dismiss their bill by decree of October 1, 1897, without granting them the relief prayed for," has been treated of with assignment No. 2.   There is some conflict of evidence as to the effect of the building of the proposed railroad on the route proposed by plaintiffs, on the works and operations of defendant in mining and shipping the products of its mines.   Justus Collins, president of the defendant company, testifies that all the improvements they then had upon the right of way of the tramroad were completed before they had notice of its contemplation, except the side track for the lump and egg coal cars above the tipple, which possibly took in part of the location of the tramroad; that its tipple, side tracks, store house, ovens, and tenant houses had all been located and erected before such notice, except the side track mentioned.   He further says:   "There are three other feasible locations for a tramroad down Crooked run, besides the one located by Glen Jean Lumber Company:   One located in August, 1896, by O. A. Veazey, an employe of Thomas G. McKell, which was intended for a broad gauge railroad from a point on the main branch of the C. & O. Railway, near our drainage opening, to the apex of the divide of Crooked run and Barren branch at the same point where the tramroad is located, to develop the back lands of Mr. McKell.   There are also two other roads located by Mr. Harmon Garner, a skilled engineer employed by the defendant, and tying up with the proposed tramway of the plaintiffs at a point beyond the end of our side tracks up Crooked run.   One of the roads then makes

connections with the proposed road of the plaintiff by the present railway station." And he states that, in his opinion, timber could be transported over the Veazey route much more easily than over plaintiff's proposed route; that Veazey's location shows a grade of four per cent., while, in his judgment, if a tramroad at defendant's tipple should be upon the grade of defendant's tracks, the grade to the low gap from that point would simply be impracticable; that neither the route located by Veazey nor that located by Garner would interfere with defendant's tipple or side tracks; that plaintiff's proposed location crosses defendant's side tracks above the tipple at an elevation above the same of six or eight feet, and would prevent it from operating the side tracks; it would come under the tipple, and prevent the operation of a box-car loader ,and the proper drainage of the waters of the creek; it would come through its stable lot on a trestle or embankment; cross its wagon road through the works at four points; would make a deep cut immediately in front of its store and office; "and generally the location of the tramway is through our very vitals, endangering possibly our teams and people in crossing back and forth from the work, and subjecting us to incalculable annoyance and damage." And he thinks it would materially interfere with the company carrying out the provisions of its lease from plaintiffs. On cross-examination Mr. Collins testified as follows in relation to the company's proposed box-car loader: "Q. How much space will your box-car loader occupy? A. About fifteen feet foundation to it. Q. I understand the box-car loader is to lie on a solid foundation of masonry. Will that occupy space between the tracks as they now are? A. No, sir; the delivery track will be thrown over between some other bents, and the foundation of the box-car loader will be placed between the bents that the delivery track now occupies, and we would throw the delivery track further over. Q. The delivery track would then occupy the proposed right of way of the tramroad? A. Yes, sir. Q. Would not the throwing of this delivery track have the same effect upon flooding the tracks of the construction of the tramroad? A. We would make proper provision for it, if we had it in our control, regardless of cost necessary to do so. Q. Could not the same thing be done with the tramroad? A. There is not room enough

for the tramroad, delivery track, and box-car loader at the location they make. If the tramroad was built over the branch between the bents next to the delivery track, we can not do anything else there, because the box-car loader and side tracks, or anything else, would interfere with the tramroad.. It blocks us completely. Q. Have you ever given the plaintiff any notice of the proposed location of your box-car loader? A. We have plans and specifications of same, and in my letter to him of April 20th, 1896, I told him: 'We find that, in order to go into the Western markets with coal in any quantities, that the coal must be loaded in box-cars; and, in order to load box-cars rapidly and economically, we should use a box-car loader. Our room around and under our tipple is very limited at the present time, and should the Glen Jean Lumber Company succeed in forcing the tramway under the tipple at the point they claim they wish to locate it, we would be utterly stopped from ever loading cars with a loader. The next time you are in Glen Jean, Mr. Nichol, who has all the plans of the box-car loader, can show you the full details. The outlook for Western business in box cars for prepared coal is great, and I am anxious to be in position to take advantage of all the trade that I can possibly reach.' To this letter Mr. McKell replied as follows: 'Yours of the 20th received. The reason for building the railroad under your tipple and through your lease is a matter of necessity, to enable Mr. Robinson to get out my timber on and back of your lease; you having refused, as I have been informed. to let your tracks be used for that purpose. The situation, as I understand it, is one of your own making. If you can make any satisfactory arrangement with Mr. Robinson that will enable him to get my timber out, which he has contracted to do, I will offer no personal objection. This, however, would have to be done promptly, as the matter is now in the hands of my attorneys; and, if I am put to further expense by your act, I will go on and have the road built, as I have a large amount of timber to come out at that point, and there are decided advantages in having control of the road. Rails have already been purchased for this purpose, but could possibly be used elsewhere. Awaiting your prompt reply, yours very truly, (Signed) T. G. McKell.' In other words, Mr. McKell threatens, unless Mr. Robinson is permitted to

use my side track, he will put that tramroad right at that point, regardless of how much he damages me or any one else." Witness H. Garner, civil engineer of some seventeen years' experience, corroborates the testimony of Collins very largely in reference to the damage to the lessee's operations, and danger to the tipple, in moving cars loaded with logs on the 6 1-2 grade, and fully corroborates him in reference to other routes than the one proposed by plaintiffs being fully as practicable for the purposes intended, and which can be constructed as cheaply and which, when constructed and used, would not interfere with defendant's operations. Witness D. E. Llewellyn, civil engineer of twelve years' actual practice, says that "if the tramroad passed under the tipple at a grade of 6 1-2 per cent., or if it approached the tipple within, say, fifty or one hundred feet, it would be a source of danger, more or less," and says he does not think the route claimed by plaintiffs is the most practicable route; that the route called the "Alternative West Route" he estimates to be cheaper of construction, and certainly as practicable as that proposed by plaintiffs, and would not interfere with any buildings, tipples, or stores, and does not touch the side tracks of defendant. J. J. Robinson, witness for plaintiffs, testifies that plaintiff's proposed route "is the most practical way," and would be the cheapest route over which to bring out the lumber; was not a civil engineer, but had over twenty years' experience in cutting, hauling, and moving lumber; was president of the Glen Jean Lumber Company, which had authority from T. G. McKell for building tramways through all his lands, and haulways, necessary for the prosecution of their business in getting out timber; that the proposed route was laid out by Engineer Thomas Nichol under his direction,—and states that "it don't touch the store. It runs through the stable yard, and under the tipple." Thomas Nichol testifies: That he was civil engineer in employment of Thomas G. McKell, and located a line of tramway or railroad from the mill of the Glen Jean Lumber Company through the leased premises of defendant. That the location was made before the addition to the store house of defendant commenced. As now contended for and located, the tramroad runs under the tipples of the defendant, and within a few feet of the front

of the store, and "would run through the addition which is being put up, and which is now occupied as offices by the Collins Colliery Company." That it could not run nearer than fifteen feet of the store. The tramroad would have to be crossed in going from those offices and over to the main part of the town, and in going to his coke ovens and to his mines. It runs along within a few feet of the side track for some five hundred or six hundred feet. The center of the proposed tramroad would be within twelve feet of the center of the defendant's side tracks as they were located, and crosses the side tracks at one place. Defendant has built some side tracks since the tramroad was located along its line, and which the tramroad would be right on top of. Says the tramroad, as located by him, could be operated by a steam engine. The maximum grade was 6 1-2 per cent. The curves were never laid down,—never run out. It was located by angles. Could not tell the degree of the curves, but could see that it was practicable to run and operate a steam engine over it. Thomas G. McKell testified: That he had had every possible avenue leading to the basin of Loup creek from his property surveyed. Had gone over the most of the routes, and inspected them, with a view of getting the most practicable grades and routes for getting out, and made a critical examination of the proposed line, and it seemed to him to be the only feasible route that would make it possible to build at an expense to the Glen Jean Lumber Company, so that it would not be compelled to take out timber at a loss. That any other route would make the timber cost more than it was worth. He examined the route with reference to seeing whether or not this privilege to the Glen Jean Lumber Company would infringe upon the privileges of the Collins Colliery Company to an unreasonable extent, and, in his judgment, he found it would not, and that his timber would be practically valueless, unless they used that route. Says he is the largest stockholder in the Glen Jean Lumber Company. Witness was asked why the Glen Jean Lumber Company did not bring this timber over the tracks of the Collins Colliery Company, and he answered that: "We started to bring the timber over their tracks, and did so until we were prevented by them unless we paid them for the privilege. Besides, the tracks of the Collins Colliery Company extend only a short distance into

this territory,—not far enough to develop the property that will be reached by the proposed line. To use the Collins track would make it too expensive, as we would have to run an engine of our own on the extended track, and it would be much cheaper to run the same through to the mill than to unload from our cars onto theirs at the end of the switch, and pay the Chesapeake & Ohio Railway Company for hauling, and the Collins Colliery Company for the use of their tracks. The privilege has, however, never been given us. For both of us to use the same track would at times be very inconvenient, causing delays and confusion." He stated that he had repeatedly requested defendant to submit to him or his engineer plans and specifications showing the location of its successive improvements, both verbally and in writing, that there would be necessary roads and railroads through their leasehold, and that they should locate their buildings under the supervision of an engineer, and cited to them the provisions in their lease, that he supposed called for such submission of their plans, to which notices no attention was paid; that such notices were given before the particular road was projected. And he filed with his deposition several letters written to defendant, to Robinson, and to J. M. Gill, superintendent Chesapeake & Ohio Railway Company, concerning the matter, which he says were duly posted, and were received by the addressees. While the evidence is conflicting to some extene, the great preponderance thereof is to the effect that plaintiffs, in locating the right of way over the leased premises, have not "used their own judgment fairly" in locating the right of way reserved to them in the lease; and the court did not err in refusing the injunction and dismissing plaintiff's bill, and the judgment is accordingly affirmed.

*Affirmed.*