**FILED**

**June 10, 2019**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 17-0126 – *Andrews et al. v. Antero Resources Corp., et al*

WORKMAN, J., dissenting:

"Throughout West Virginia's history, [this] Court has attempted to balance the rights of surface owners entitled to the peaceful enjoyment of their land with the rights of mineral owners entitled to access and to produce their minerals underneath the surface."[1] In the instant case, the majority failed to provide any guidance on striking a proper balance between these rights. I must dissent.

## I. Background

This is an appeal from the Mass Litigation Panel's (the "MLP") award of summary judgment in favor of Respondents Antero Resources Corporation ("Antero") and Hall Drilling LLC ("Hall") (collectively "Respondents") dismissing Petitioners'[2] hydraulic fracturing or "fracking"-based nuisance claims.[3] In its summary judgment order, the MLP explained the distinction between horizontal and vertical drilling:

> 3. The activity at issue in this complaint is horizontal well drilling and hydro-fracturing as part of the development of the Marcellus Shale in West Virginia. Traditional oil and gas wells in West Virginia are vertical wells, with smaller drill rigs

---

[1] Jason A. Proctor, *The Legality of Drilling Sideways: Horizontal Drilling and Its Future in West Virginia*, 115 W. Va. L. Rev. 491, 500 (2012).

[2] Petitioners form a portion of the "Cherry Camp Trial Group," the first trial group to be resolved by the MLP.

[3] Recovering natural gas from the Marcellus Shale requires horizontal drilling and hydraulic fracturing (commonly called "fracking") technologies.

1

and fairly small well pads, located on one-third to one-half of an acre of land. A well road is built, the well pad is built, and the drill rig drills the vertical well several thousands of feet deep. After the well is drilled, a steel casing is put in the well, the drill rig leaves, and a hydro-fracturing company comes in to fracture the well. After the well is fractured and flow-back occurs, production starts and pipelines carry the natural gas from the well head to a larger transmission line for transport to market. . . .

4. With the development of the Marcellus Shale, horizontal drilling is used to recover natural gas. Horizontal drilling requires a vertical well to be drilled, then the drill bit is turned and runs underground in a horizontal direction, extending anywhere from 2,000 to 10,000 feet away from the vertical well site. . . . Several underground, horizontal wells are drilled away from the vertical well sites, much like a spider web design. Because of the horizontal drilling, more wells can be located on one well pad. Consequently, the well pads are usually larger, there are more hydro-fracturing zones, hydro-fracturing takes a longer period of time, and it takes more sand and water. . . .

Fracking is a recently-emerging new technology[4] and this Court has not had an opportunity to address balancing the rights of surface and mineral owners in this context.

Marcellus production occurs primarily in five states: Pennsylvania, New York, Maryland, Ohio, and West Virginia. While the majority of gas production expansion thus far has taken place in Pennsylvania, West Virginia has also seen a

---

[4] *See* Proctor, *The Legality of Drilling Sideways: Horizontal Drilling and Its Future in West Virginia*, 115 W. Va. L. Rev. at 494-95 ("The current Marcellus Shale gas 'play' appears to have begun in 2003, when Range Resources drilled a natural gas well in Washington County, Pennsylvania. . . . By the end of 2007, 'more than 375 gas wells with suspected Marcellus intent had been permitted in Pennsylvania' alone. Following the initial discovery, interest in the Marcellus skyrocketed, and natural gas producers across the country began to acquire land and business interests in the region and to drill vertical and horizontal wells in order to evaluate the gas potential of the Marcellus.") (footnotes omitted).

significant increase in production. In August 2011, reports showed that "natural gas production in West Virginia and Pennsylvania now averages almost four billion cubic feet per day (Bcf/d), more than five times as much as the average from 2004 through 2008." These two states are now responsible for more than eighty-five percent of all natural gas production in the Northeast. Furthermore, production in West Virginia "has grown over [forty percent] since January 2010 and recently surpassed [one] Bcf/d." It appears that the Marcellus Shale will play an integral role in the West Virginia energy industry for years to come. This production boom would not have been possible without the help of a novel drilling technique—horizontal drilling.

Proctor, *The Legality of Drilling Sideways: Horizontal Drilling and Its Future in West Virginia*, 115 W. Va. L. Rev. at 496 (footnotes omitted).

The majority did only a cursory analysis of existing principles of law requiring balance between mineral owners versus surface owners; and failed to enunciate *any* legal guidance for such conflict in the context of fracking when the claims of more than *200 plaintiffs* remain pending before the MLP. Both the MLP and the majority are wrong in holding that a nuisance claim is not tenable under any set of facts when mineral owners act within their implied rights; and they are wrong in failing to establish any analytical framework for creating balance between the sets of competing rights.

For a century, the tenor of our mineral easement caselaw, in each temporal and technological ideation, has been that there must be a balance of the rights of surface owners and mineral owners. Rather than making any attempt to establish legal guidance

3

for that goal in this new context, the majority endorses a gross inequity that effectively gives this new industrialization *carte blanche* to operate without any regard for the rights of those who live on the land.

II. Legislature Declares Surface and Mineral Owners Rights' are Equivalent

The Legislature has made it plain that the effect of this method of oil and gas production was not reasonably contemplated at the time of most original mineral severances. The Oil and Gas Production Damage Compensation Act (W. Va. Code §§ 22-7-1 to -8), the Natural Gas Horizontal Well Control Act (W. Va. Code §§ 22-6A-1 to -24), and the Oil and Gas Horizontal Well Production Damage Compensation Act (W. Va. Code §§ 22-6B-1 to -8) all express legislative findings that current oil and gas production methods were not reasonably contemplated at the time of the original severances. More importantly, the Legislature has recognized that our existing common law is not sufficiently accommodating of those developments, necessitating Legislative intervention by way of the above relief acts. Specifically, the Legislature has declared that

> . . . [t]he advent and advancement of new and existing technologies and drilling practices have created the opportunity for the efficient development of natural gas contained in underground shales and other geologic formations;
>
> (2) These practices have resulted in a new type and scale of natural gas development that utilize horizontal drilling techniques, allow the development of multiple wells from a single surface location, and may involve fracturing processes that use and produce large amounts of water[] . . . .

4

* * *

> (4) *Existing laws and regulations developed for conventional oil and gas operations do not adequately address these new technologies and practices*[.]

W. Va. Code § 22-6A-2(a) (1 through 4) (2014) (emphasis added).


While clearly enunciating a State policy in support of fracking, the Legislature has made clear that surface and mineral owners' rights are *equivalent*. Both the Oil and Gas Horizontal Well Production Damage Compensation Act and the Oil and Gas Production Damage Compensation Act provide that "[e]xploration for and development of oil and gas reserves in this state *must coexist with the use, agricultural or otherwise, of the surface of certain land and that each constitutes a right equal to the other*." W. Va. Code § 22-6B-1(a)(1) (emphasis added); *see also* W. Va. Code § 22-7-1(a)(1) ("Exploration for and development of oil and gas reserves in this State must coexist with the use, agricultural or otherwise, of the surface of certain land and that each constitutes a right equal to the other.").[5] Instead of acknowledging this unmistakable statement of public policy, the majority designates the rights of adjacent surface owners to

---

[5] The wording of these Acts appears to limit its relief to those surface owners upon whose surface actual, physical entry occurs: "'Drilling operations' means the actual drilling or redrilling of a horizontal well commenced subsequent to the effective date of this article, and the related preparation of the drilling site and access road, which requires entry, upon the surface estate[.]" W. Va. Code § 22-6B-2(1). *See also* W. Va. Code § 22-7-1(d) ("It is the purpose of this article to provide constitutionally permissible protection and compensation to surface owners of lands on which oil and gas wells are drilled from the burden resulting from drilling operations[.]").

5

the reasonable use of their surface estates as subservient to the unmitigated right of mineral owners or lessees to develop their minerals in the manner most convenient for them.

## III. Nuisance Analysis

Initially, Petitioners filed claims alleging both nuisance and negligence. However, the property damage claims were withdrawn, leaving only the nuisance claims. Petitioners alleged that Respondents' fracking activities substantially impaired their quality of life, use, and enjoyment of their property including

> loud noises, concerns about well water safety, flooding due to diversion of water, loss of air quality, excessive dust, mud, bright lights, emissions diesel fumes, exhaust fumes, gas fumes and odors, excessive traffic delays/road blockages, rude, aggressive and generally dangerous drivers, speeding of very large trucks, vehicle damage due to poor road conditions, rude and interrogative flag persons, chemical spills in the streams and waters of Cherry Camp, vibrations/shaking, explosions/blasting, flaring, blow offs of condensate tanks, pipeline blow outs, an invasion of mostly out-of-state workers with little regard or respect for local residents, and trespassing.

As the majority points out, however, the MLP granted summary judgment based strictly on property and contractual rights, specifically holding that:

> In addition to the foregoing leases and severance deeds, Antero executed various other agreements with several Plaintiffs, or the owners of the properties on which Plaintiffs reside, entitling Antero to use Plaintiffs' properties in the course of its mineral development. These various agreements include right of way agreements, an oil and gas lease, road use agreements, surface use agreements, tank pad agreements, and pipeline easements.

6

Because the MLP specifically excluded any analysis of the issues in the context of nuisance law, the majority holds that the issue of whether there can be a private nuisance claim against the mineral owner rights is not proper for review.[6] Instead, the majority holds that because Respondents hold an implied easement for use of the surface estates, they have the right "to the extent reasonable and necessary" to develop the mineral leasehold. While the reasonable and necessary standard is consistent with our law in this area, the majority ignores the fundamental premise that "[w]hether or not the use of the surface estate by the mineral estate owner is reasonably necessary is a question of fact for the trier of facts[,]"[7] generally precluding summary judgment.

The majority hinges its analysis on two points: (1) because there is no physical damage to the property; and (2) because vertical wells would create an even greater physical intrusion into the surface estate, there is no substantial burden. In effect, the majority implicitly suggests that landowners who are negatively affected by the large-scale, around-the-clock industrialization are without recourse because individual vertical wells would, in their academic exercise, be even worse. This is completely disingenuous

---

[6] Contrary to the majority's assertions, this issue was clearly before this Court. In their assignment of error two, Petitioners state: "The [Mass Litigation] Panel erred in concluding that an owner of mineral rights underlying a particular property has the right to create a nuisance on the surface of that tract to develop minerals underlying another property."

[7] *Hunt Oil Co. v. Kerbaugh*, 283 N.W.2d 131, 137 (N.D. 1979); *but see Adkins v. United Fuel Gas Co.*, 134 W. Va. 719, 61 S.E.2d 633 (1950) (stating, in dicta, that issue of whether mineral owner has exceeded his implied rights is question for court).

7

and constitutes classic "ducking" of the real issue. The majority's refusal to further develop our existing law to accommodate the need to balace the physical and atmospheric disturbances occasioned by fracking leaves West Virginia surface owners completely without recourse under any circumstances.

The majority should have recognized existing law on the issue presented as well as undertaken an analysis in this very new and different technological context. In his concurring opinion in *Robinson Township v. Commonwealth*, 83 A.3d 901 (Pa. 2013), Justice Baer offered an apt description of fracking activities:

> these industrial-like operations include blasting of rock and other material, noise from the running of diesel engines, sometimes nonstop for days, traffic from construction vehicles, tankers, and other heavy-duty machinery, the storage of hazardous materials, constant bright lighting at night, and the potential for life—and property—threatening explosions and gas well blowouts.

*Id.* at 1005 (Baer, J., concurring).

Even though the techniques in the instant case were found to be normal fracking operations—not outside the realm of what is reasonably necessary and therefore within the scope of the easements—a surface owner should still have the right to assert a nuisance cause of action if the scope or conduct of the operations is so abusive or unreasonable as to render the balance of rights completely out of kilter. The majority relies on *Quintain Development, LLC v. Columbia Natural Resources, Inc.*, 210 W. Va. 128, 556 S.E.2d 95 (2001), to dodge the real issue. But *Quintain* is patently distinguishable as it

8

addressed a narrow and inapposite issue—a coal mining company's lawsuit to force the relocation of a natural gas pipeline so that coal could be removed by means of surface mining. Stretching *Quintain* beyond reasonable limits, the majority finds that the legal right to conduct mineral development operations necessarily and completely destroys any potential nuisance claim. This holding is contrary to black letter nuisance law.

Unlike a trespass, which is inherently unlawful, a private nuisance may flow from the consequences of an otherwise lawful act. *See e.g.*, *Baumann v. Snider*, 532 S.E.2d 468, 472 (Ga. 2000) ("The distinction between trespass and nuisance consists in the former being a direct infringement of one's right of property, while in the latter the infringement is the result of an act which is not wrongful in itself, but only in the consequences which may flow from it."); *Firth v. Scherzberg*, 77 A.2d 443 (Pa. 1951) (finding nighttime trucking operation constituted nuisance despite being permitted as a nonconforming use under ordinance). Consequently, the fact that Respondents are exercising valid leasehold rights should not obliterate Petitioners' potential nuisance claims. It is not the nature of the right; it is the scope, manner, and extent of exercising these rights which under some factual circumstances could constitute an actionable nuisance.

An actionable nuisance has been defined by this Court as follows:

> A private nuisance is a *substantial* and *unreasonable* interference with the private use and enjoyment of another's land.

9

An interference with the private use and enjoyment of another's land is unreasonable when the gravity of the harm outweighs the social value of the activity alleged to cause the harm.

Syl. Pts. 1 and 2, *Hendricks v. Stalnaker*, 181 W. Va. 31, 380 S.E.2d 198 (1989) (emphasis added).

Once the MLP effectively determined that there could be no nuisance claim under any circumstances, any potential balancing of rights dissipated. The tenets of what constitutes a nuisance in surface/mineral rights together with whether there was a dispute of material fact should have formed the scope of the inquiry in this case by the MLP in ruling on the motion for summary judgment.

The majority errs in effectively upholding the MLP's legal conclusion that there can be no nuisance action under any set of facts in light of the severance deeds. Certainly, in an ordinary nuisance claim, a property owner is typically exercising his ownership rights, but neighboring property owners unduly and improperly disturbed by his actions are not without a remedy. Rather, they clearly have the remedy of a nuisance cause of action. However, in the mineral development context, by refusing to address this issue, the majority effectively holds that having an equivalent, valid legal right to conduct operations necessarily destroys any nuisance claim. This is not only inconsistent with the concept of nuisance and any sense of balance and fairness, but also contrary to the history

10

and caselaw in the mineral/surface conflict context as well as statute. The Oil and Gas

Production Damage Compensation Act provides that

> [n]othing in . . . in this article shall be construed to diminish in any way the common law remedies, including damages, of a surface owner or any other person against the oil and gas developer for the unreasonable, negligent or otherwise wrongful exercise of the contractual right, whether express or implied, to use the surface of the land for the benefit of the developer's mineral interest.

W. Va. Code § 22-7-4(a).  Undoubtedly,

> [n]uisance is the most common cause of action asserted against oil and gas operators related to hydraulic fracturing operations. For instance, in *Harris v. Devon Energy Production Co., L.P.*, the plaintiffs claimed that the defendant's drilling-related activities created a private nuisance on the plaintiffs' property. The plaintiffs claimed that the acts and omissions of the defendant resulted in the contamination of the groundwater under plaintiffs' land, which substantially interfered with plaintiffs' use and enjoyment of their groundwater for drinking, bathing, and washing. They also claimed that the contaminated well water offended plaintiffs' senses and made their enjoyment of their property uncomfortable and inconvenient. In *Fiorentino v. Cabot Oil & Gas Corp.*, the plaintiffs claimed that defendants created and maintained a continuing private nuisance by allowing gas wells to exist and operate in a dangerous and hazardous condition, allowing the spills and releases to spread to surrounding areas, including plaintiffs' properties and drinking water supplies, resulting in injuries to plaintiffs' health, well-being, and property.

Michael Goldman, *A Survey of Typical Claims and Key Defenses Asserted in Recent Hydraulic Fracturing Litigation*, 1 Tex. A&M L. Rev. 305, 310 (2013) (footnotes omitted).

In their depositions, Petitioners described how Respondents' activities constituted a nuisance, i.e., "a substantial and unreasonable interference with the private use and enjoyment" of their land. Syl. Pt. 1, in part, *Hendricks*, 181 W. Va. 31, 380 S.E.2d 198. Petitioners testified about nonstop noise from trucks driving past their homes all hours of the day and night so loud that they could not have conversations. The constant noise, vibrations, and truck traffic prevented Petitioners from sitting on their front porches on summer evenings and interfered with their sleep. Petitioners also testified about constant dust and odors from diesel trucks with the smell of diesel fumes so intense it caused headaches. Petitioners stated the vibrations from the trucks and operations were so damaging that their homes would rattle and shake like they were living on a volcano. Petitioners described truck lights shining so brightly they would light up their bedrooms even with the blinds shut.

Petitioners' experts, Drs. Cheremisinoff and Ingraffea, confirmed this testimony. The experts described how Respondents' fracking operations brought widescale industrialization within Petitioners' small community. These operations caused various negative consequences including contaminated air, increased ozone and smog, noise disturbances, light disturbances, and contaminated ground and surface water. Ultimately, Dr. Cheremisinoff opined that Respondents acted in a reckless and careless manner and with callous indifference toward their neighbors. He concluded that Respondents were not relying on reasonable and best industry practices and the well extraction sites and compressor station were creating significant levels of air pollution.

12

IV. Competing Property Rights Must be Balanced

A review of existing caselaw on surface owner versus mineral owner rights is informative. While surface rights have historically been considered subservient to mineral rights in that there must be disturbance of the surface in order to access the minerals, throughout our cases, whether in vertical drilling, coal mining, or strip mining, this Court—like most courts in the country—has recognized that the rights of each must be balanced. In syllabus point one of *Oresta v. Romano Brothers*, 137 W. Va. 633, 73 S.E.2d 622 (1952), we held: "A person in possession of land is required so to use it as not to injure the property of another person." As we explained in *Buffalo Mining Co. v. Martin*, 165 W. Va. 10, 267 S.E.2d 721 (1980),

> [o]ur past cases have demonstrated that any use of the surface by virtue of rights granted by a mining deed must be exercised reasonably so as not to unduly burden the surface owner's use. *Adkins v. United Fuel Gas Co.*, 134 W. Va. 719, 61 S.E.2d 633 (1950); *Porter v. Mack Manufacturing Co.*, 65 W. Va. 636, 64 S.E. 853 (1909); cf. *McKell v. Collins Colliery Co.*, 46 W. Va. 625, 33 S.E. 765 (1899).
>
> We conclude that where implied as opposed to express rights are sought, the test of what is reasonable and necessary becomes more exacting, since the mineral owner is seeking a right that he claims not by virtue of any express language in the mineral severance deed, but by necessary implication as a correlative to those rights expressed in the deed. In order for such a claim to be successful, it must be demonstrated not only that the right is reasonably necessary for the extraction of the mineral, but also that the right can be exercised without any substantial burden to the surface owner. *Porter v. Mack Manufacturing Co., supra*. This concept has been most clearly articulated in oil and gas cases. *See, e.g., Flying Diamond Corp. v. Rust*, 551 P.2d 509 (Utah 1976) (surface easement "consistent with allowing the fee owner the greatest possible

13

use of his property"); *Getty Oil Co. v. Jones*, 470 S.W.2d 618 (Tex. 1971); Annot., 53 A.L.R.3d 16 (1973).

*Buffalo Mining*, 165 W. Va. at 18, 267 S.E.2d at 725-26 (footnote omitted).

In recent years, courts have emphasized that mineral owner rights must be balanced against the rights of the surface owners. *See*, *e.g.*, *Faith United Methodist Church & Cemetery of Terra Alta v. Morgan*, 231 W. Va. 423, 440, 745 S.E.2d 461, 478 (2013) (recognizing surface owner has right to use surface for such ordinary uses as may be made thereof, with right to use as much of subsurface as may be necessary for customary and ordinary uses of surface, just as owner of subsurface estate has correlative right to use surface in order to develop subsurface rights).

Our precedent establishes that mineral and surface estates must exercise their respective rights with due regard each for the other's. This principle underlies the accommodation doctrine, which was developed by the Supreme Court of Texas in *Getty Oil Co. v. Jones*, 470 S.W.2d 618 (Tex. 1971).[8] The accommodation doctrine has provided a sound and workable basis for resolving conflicts between various ownership interests. Although developed in the context of vertical drilling, this doctrine has broad application to the issue at hand.

---

[8] The *Getty* court found: "where there is an existing use by the surface owner which would otherwise be precluded or impaired, and where under the established practices in the industry there are alternatives available to the lessee whereby the minerals can be recovered, the rules of reasonable usage of the surface may require the adoption of an alternative by the lessee." *Id*. at 622.

14

> A definite trend toward conciliation of conflicts and accommodation of both estates is evident in our court decisions and in the conduct between the lessees and surface owners. . . . This Court has led the way in working out accommodations which preserve unto the severed mineral owner or lessee a reasonable dominant easement for the production of his minerals while at the same time preserving a viable servient estate.

*Sun Oil Co. v. Whitaker*, 483 S.W.2d 808, 817 (Tex. 1972).

In some instances, the accommodation doctrine requires the owner of the mineral estate to make modifications of its proposed use of the surface to accommodate the surface estate owner, at least to the extent possible consistent with the right of the owner of the mineral estate to develop the minerals. *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913 (Colo. 1997); *see also Coyote Lake Ranch, LLC v. City of Lubbock*, 498 S.W.3d 53, 60-61 (Tex. 2016) (finding accommodation doctrine applied to relationship between city, as owner of severed groundwater estate, and surface estate held by landowners; city was required to exercise its implied right to use of surface estate with due regard for landowners' rights). By way of analogy, although the methods necessary for fracking will create unavoidable disruption, annoyance, and inconvenience to surface owners who reside on the property, each side should be willing to seek accommodation to the degree reasonable with the other's interests.

Practically speaking, the accommodation doctrine requires the mineral owner to use available, non-interfering, and reasonable ways of producing the minerals which

15

would permit the surface owner to continue his existing use of the surface;[9] although by virtue of the very nature of fracking, those residing on the surface will have increased traffic, inconvenience, annoyance, dust, loud noise, and excessive light, the right of the mineral owner to enter and use the surface is not unfettered. Nothing in this opinion is intended to suggest that surface owners will have the kind of peaceful enjoyment of their property as they had prior to the fracking operation, just that neither side has the right to act in derogation of the rights of the other. Such accommodations, even if they make drilling operations less convenient or profitable, are not per se unreasonable. These determinations are highly fact-specific. As aptly explained in *Hunt Oil*,

> [w]hat may be a reasonable use of the surface by the mineral lessee on a bald prairie used only for grazing by the servient surface owner could be unreasonable within an existing residential area of the City of Houston, or on the campus of the University of Texas, or in the middle of an irrigated farm. What we have said is that in determining the issue of whether a particular manner of use in the dominant estate is reasonable or unreasonable, we cannot ignore the condition of the surface itself and the uses then being made by the servient surface owner.

284 N.W.2d at 136.

Applying this principle to the instant case, the central issue is whether Respondents' fracking operations should be subject to reasonable modification in order not

---

[9] *See* Tara Righetti, *Contracting for Sustainable Surface Management*, 71 Ark. L. Rev. 367 (2018) (examining accommodation doctrine as background for discussion of "surface use agreements" whereby surface users and mineral owners tailor agreements to suit anticipated use by mineral owner, existing and planned uses of surface owner, unique topographical and ecological conditions of surface parcel, and priorities of surface owner).

to constitute an actionable nuisance or, in the alternative, whether surface owners should be able to assert a cause of action for damages for nuisance. For instance, a fact finder may find that it is not reasonable for Respondents to run speeding trucks up and down rural roads twenty-four hours a day with jack brakes blaring. Rather, alternative methods such as specific times to run these trucks may be employed to accommodate the rights of the surface owners while still facilitating transport of the sand, water, and other materials and equipment needed for production. The cost of periodic amelioration of dust could be borne by drillers; and compliance with groundwater regulations are examples of possible accommodations so surface owners are not living in constant worry about their families' health.

This case also highlights the need for surface and mineral owners to consider negotiating a surface use agreement to avoid using litigation to define their respective rights and obligations. Mineral owners/operators are often willing to accept manageable delays in order to negotiate a use agreement with the surface owner. The parties should consider the following terms:

(1) Timing and coordination of operations;
(2) Predetermined, reserved, and platted future sites, access roads, and rights-of-way corridors;
(3) Locations of any associated production equipment;
(4) Coordination of future surface development;
(5) Setback requirements (this may be required by regulations);
(6) Noise mitigation (this may be required by regulations);
(7) Visual aesthetics (this may be required by regulations);
(8) Safety issues (this may be required by regulations);
(9) Compensation for oil and gas directional and horizontal drilling costs from centralized drilling pads;

17

(10) Timing of operations (i.e., based on planting, harvesting, or hunting seasons);

(11) Use of surface or well water in exploration and production;

(12) Disposal/discharge of produced water (this may be required by regulations);

(13) Abandonment procedures following the completion of operations (this may be required by regulations); and

(14) Reclamation (this may be required by regulations).[10]

If the conflicting owners fail to do so, then court-ordered mediation should center not just on monetary damages, if any, but on how both sides can work effectively together to accommodate their conflicting interests. Neither side will like this accommodation plan because drillers want maximum profit in the shortest time and attorneys for surface owners, while trying to protect the interests of their clients, want maximum damages. Sorting all this out can be a tedious process for courts, as well, and may even at times require additional proceedings before the MLP.[11]

---

[10] Kendor P. Jones, John F. Wellborn, Chelsey J. Russell, *Split Estates and Surface Access Issues*, Landman's Legal Handbook Ch. 9 (Rocky Mt. Min. L. Fdn., (5th ed. 2013)) at www.wsmtlaw.com/cms-assets/documents/129546-236263.00194839.pdf.

[11] Rule 26.07 of the West Virginia Trial Court Rules provides:

> (b) If the [Mass Litigation] Panel requests the assignment of additional active or senior status circuit court judges to assist in resolving Mass Litigation or proceedings therein, the request and recommendation shall be filed with the Clerk of the Supreme Court of Appeals and sent to the Chief Justice. The order of assignment by the Chief Justice shall be filed with the Clerk and sent by the Clerk to the Panel Chair

Although Petitioners at this juncture have dropped their property claims, numerous environmental/groundwater citations already issued demonstrate the relentlessness of this heavy and untrammeled industrialization and the significant worry about potential health consequences to Petitioners and their families. The potential claims of groundwater contamination were identified by the Natural Resources Defense Council ("NRDC") in its recently released report concluding that fracking has dramatically stressed West Virginia's groundwater resources.[12] NRDC states that chemical constituents used by well operators during drilling, fracking, or maintenance vary greatly but often include contaminates that pose serious threats to human health. *Id.*

> What about claims of flaming water? The theory is that fracturing releases methane gas, and the gas migrates to groundwater, finding its way into landowners' wells. The claim is that methane escapes through home faucets, creating fire hazards. Landowners complain that other chemicals, such as benzene, enter the water supply through ground spills and improper disposal techniques.
>
> Landowners claim that careless treatment of fracture fluids allows chemicals to enter aquifers, water wells and soil. They contend that fumes from diesel-powered engines cause them to inhale large quantities of nitrogen oxides, carbon

---

> and to the clerk of the circuit court where the Mass Litigation is pending for service on all parties.

[12] Natural Resource Defense Council, *West Virginia's Groundwater is not Adequately Protected from Underground Injection* (April 2019) at https://www.nrdc.org/resources/west-virginias-groundwater-not-adequately-protected-underground-injection.

monoxide and other chemicals. Also, fracturing and drilling create smog and dust[.[13]]

*See also* Kaoru Suzuki, *The Role of Nuisance in the Developing Common Law of Hydraulic Fracturing*, 41 B.C. Envtl. Aff. L. Rev. 265, 271-72 (2014) ("Numerous complaints from citizens near hydraulic fracturing wells, who alleged that methane gas and fracking fluid additives had contaminated their drinking water, spurred the EPA to reinvestigate. For example, citizens in the Marcellus Shale region, which spans Pennsylvania and upstate New York, have raised numerous concerns about the safety of drinking water from their underground water supply. Documentaries show tap-water discoloration, the emission of unnatural odors, and even flammable tap water in affected regions.") (footnotes omitted).


## V. Conclusion

The majority's refusal to develop our law to provide a workable set of standards that balances the rights of surface and mineral owners is untenable. The MLP and the majority opinion of this Court effectively preclude any cause of action for nuisance while completely eviscerating existing legislative and caselaw. This Court should have enunciated the parameters of a nuisance claim in the fracking context; and we should have remanded the case with directions for the MLP to determine whether sufficient material issues of fact exist to permit a jury, under proper instruction of law, to decide whether

---

[13] Michael J. Mazzone, *Changing Times Bring Conflict With Surface O*wners, The American Oil & Gas Reporter (Dec. 2011) at https://www.aogr.com/web-exclusives/exclusive-story/changing-times-bring-conflict-with-surface-owners.

Respondents' actions constitute a nuisance, and if so, what damages should be awarded. In cases still pending, there should be a court-directed process to mediate competing rights of surface/mineral owners.

Accordingly, I respectfully dissent. I am authorized to state that Judge Clawges joins in this dissent.