# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**January 2020 Term**

_____

**No. 18-0871**

_____

**FILED**
**April 24, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**DEBRA K. BAYLES,**
**Plaintiff Below, Petitioner**

v.

**JEFFREY N. EVANS,**
**AMERIPRISE FINANCIAL SERVICES, INC.,**
**KRISTINA NICHOLLS, and STEPHEN BAYLES,**
**Defendants Below, Respondents**

**AND**

_____

**No. 18-0876**

_____

**JEFFREY N. EVANS,**
**AMERIPRISE FINANCIAL SERVICES, INC.,**
**KRISTINA NICHOLLS, and STEPHEN BAYLES,**
**Defendants Below, Petitioners**

v.

**DEBRA K. BAYLES,**
**Plaintiff Below, Respondent**

_____

**Appeals from the Circuit Court of Marshall County**
**The Honorable David W. Hummel, Jr., Judge**
**Civil Action No. 14-C-139**

**AFFIRMED, IN PART, REVERSED, IN PART**

_____

**Submitted: February 11, 2020**

**Filed: April 24, 2020**

Herman D. Lantz, Esq.
Lantz Law Offices
Moundsville, West Virginia
Chad Groome, Esq.
David Jividen, Esq.
Jividen Law Office
Wheeling, West Virginia
Counsel for the Plaintiff

Edward P. Tiffey, Esq.
Tiffey Law Practice, PLLC
Charleston, West Virginia
Counsel for Defendants Jeffrey N.
Evans and Ameriprise Financial
Services, Inc.

Christi R.B. Stover, Esq.
Steptoe & Johnson, PLLC
Morgantown, West Virginia
Ancil G. Ramey, Esq.
Steptoe & Johnson, PLLC
Huntington, West Virginia
Counsel for Defendants Kristina
Nicholls and Stephen Bayles

**JUSTICE HUTCHISON delivered the Opinion of the Court.**

**CHIEF JUSTICE ARMSTEAD, deeming himself disqualified, did not participate.**

**JUDGE JENNIFER P. DENT, sitting temporarily by assignment.**

**SYLLABUS BY THE COURT**

1.      "Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo*."  Syllabus Point 2, *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 461 S.E.2d 516 (1995).

2.      "When a trial court is required to rule upon a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–307 (2006), the authority of the trial court is limited to determining the threshold issues of (1) whether a valid arbitration agreement exists between the parties; and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement."  Syllabus Point 2, *State ex rel. TD Ameritrade, Inc. v. Kaufman*, 225 W. Va. 250, 692 S.E.2d 293 (2010).

3.      "A court may not direct a nonsignatory to an agreement containing an arbitration clause to participate in an arbitration proceeding absent evidence that would justify consideration of whether the nonsignatory exception to the rule requiring express assent to arbitration should be invoked."  *State ex rel. United Asphalt Suppliers, Inc. v. Sanders*, 204 W. Va. 23, 511 S.E.2d 134 (1998).

4.      "A signatory to an arbitration agreement cannot require a non-signatory to arbitrate unless the non-signatory is bound under some traditional theory of contract and agency law.  The five traditional theories under which a signatory to an arbitration agreement may bind a non-signatory are: (1) incorporation by reference; (2)

i

assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel." Syllabus Point 10, *Chesapeake Appalachia, L.L.C. v. Hickman*, 236 W. Va. 421, 781 S.E.2d 198 (2015).

5.      "Under the Federal Arbitration Act, 9 U.S.C. § 2, and the doctrine of severability, only if a party to a contract explicitly challenges the enforceability of an arbitration clause within the contract, as opposed to generally challenging the contract as a whole, is a trial court permitted to consider the challenge to the arbitration clause." Syllabus Point 4, in part, *State ex rel. Richmond Am. Homes of W. Virginia, Inc. v. Sanders*, 228 W. Va. 125, 717 S.E.2d 909 (2011).

**HUTCHISON, Justice**:

In this appeal from the Circuit Court of Marshall County, we are asked to examine an order compelling a plaintiff to arbitrate her dispute with an investment firm. The plaintiff's deceased husband created two accounts with the investment firm (the "brokerage account" and the "portfolio account"), and the contracts he signed required the arbitration of any account disputes. The plaintiff asserts she is the proper beneficiary and should have received the proceeds of both accounts upon her husband's demise. However, the investment company paid the proceeds of both accounts to two other individuals (the husband's children by another marriage).

The plaintiff brought suit to assert her right to the proceeds of both accounts. The circuit court found that, even though the plaintiff was a nonsignatory she was required to comply with the arbitration agreements signed by her deceased husband.

As we discuss below, despite her being a nonsignatory, the circuit court's order correctly determined that the plaintiff is required to arbitrate her claims to the proceeds of both accounts. However, we find that the circuit court included surplus language in its order that invaded the province of the arbitrator. As we discuss later in our opinion, the order is reversed to the extent it included this language. We otherwise affirm the circuit court's order dismissing the plaintiff's suit and compelling her to arbitrate.

1

# I. Factual and Procedural Background

William Nelson Bayles was married to his second wife, plaintiff Debra Bayles, for 22 years. During his career, Mr. Bayles had invested in his employer's 401(k) retirement plan,[1] and he designated the plaintiff as the beneficiary of that plan. However, the record suggests that, by early 2012, medical issues compelled Mr. Bayles to find ways to access the money in the 401(k) plan.

Mr. Bayles had two children from his prior marriage: defendants Kristina Nicholls and Stephen Bayles. In early 2012, Kristina introduced her father to a friend she had in the financial industry, defendant Jeffrey Evans, who worked for an investment company, defendant Ameriprise Financial Services, Inc. ("Ameriprise"). Defendant Evans explained to Mr. Bayles that he could access his money by rolling the 401(k) plan over into an Ameriprise individual retirement account ("IRA"). However, Evans also explained that, under federal law, the plaintiff would have to agree to the rollover.[2]

---

[1] *See* 26 U.S.C. § 401(k).

[2] In order to rectify certain inequities arising under pension plans managed under the Employee Retirement Income Security Act ("ERISA"), Congress adopted the Retirement Equity Act of 1984 ("REACT"). REACT amended ERISA by, among other things, "providing for automatic survivor benefits to the spouses of vested [ERISA plan] participants." *Heisler v. Jeep Corp.–UAW Retirement Income Plan*, 807 F.2d 505, 509 (6th Cir.1986) (cleaned up). In the context of this case, REACT guaranteed that Mrs. Bayles would receive a survivor's share of Mr. Bayles's 401(k) plan.

REACT prevents a vested plan participant from withdrawing benefits from the ERISA-regulated plan, to the detriment of the participant's spouse, without first

Continued . . .

2

On June 20, 2012, Mr. Bayles returned to Evans's Ameriprise office, this time in the company of the plaintiff (Mrs. Bayles). At this meeting, Mr. Bayles signed an application to create the "brokerage account," an Ameriprise IRA account to receive money rolled over from his 401(k) plan.[3] The application incorporates a requirement that Mr. Bayles arbitrate any dispute he might have with Ameriprise regarding the brokerage account.

When Mr. Bayles completed and signed the application to create the brokerage account, he designated the plaintiff as the sole beneficiary. Central to the plaintiff's dispute is her claim that, during the June 2012 meeting, Evans told her that she

_____

obtaining the spouse's consent. REACT establishes the following requirements for a spouse to waive his or her right to survivor benefits:

> Each plan shall provide that an election [by a plan participant to waive plan benefits] shall not take effect unless—
>
> (A)(i) the spouse of the participant consents in writing to such election, (ii) such election designates a beneficiary (or a form of benefits) which may not be changed without spousal consent (or the consent of the spouse expressly permits designations by the participant without any requirement of further consent by the spouse), and (iii) the spouse's consent acknowledges the effect of such election and is witnessed by a plan representative or a notary public. . . .

29 U.S.C. § 1055(c)(2)(A)(i). In other words, REACT prevented Mr. Bayles from electing to withdraw the funds from his 401(k) without first obtaining the written consent of Mrs. Bayles.

[3] Specifically, Mr. Bayles signed an "Ameriprise Brokerage Individual Retirement Account Application" on June 20, 2012.

*could not* be removed as the beneficiary; conversely, Evans says he told the plaintiff that the beneficiary designation *could* be changed.

What is undisputed is that after the June of 2012 meeting, Mr. Bayles initiated the process of moving the proceeds of his 401(k) plan into his newly created Ameriprise brokerage account. The record shows that, on June 26, 2012, Mr. Bayles signed forms from his employer to transfer money out of the 401(k) plan. More importantly, the plaintiff also signed a "spousal consent" form that permitted Mr. Bayles to complete the transfer. Thereafter, his employer transferred a lump sum of $132,660.86 into the Ameriprise brokerage account.

On September 5, 2012, Mr. Bayles returned to defendant Evans's Ameriprise office, but did not take the plaintiff or inform her of the visit. During this visit, Mr. Bayles completed and signed two documents. With the first document, Mr. Bayles created a second Ameriprise account: the "portfolio account."[4] The portfolio account was funded with a transfer of $100,000.00 from the brokerage account. As with the brokerage account, this document incorporated Mr. Bayles's agreement that any disputes regarding the portfolio account would be subject to arbitration.

---

[4] The first document completed and signed by Mr. Bayles was titled "Active Portfolios Account Application."

4

On the application to create the portfolio account, Mr. Bayles designated the plaintiff as the beneficiary of the portfolio account.

This dispute seems to arise from the second document completed and signed by Mr. Bayles on September 5, 2012. This document was a change of beneficiary form.[5] On the form, Mr. Bayles appeared to authorize Ameriprise to change the beneficiaries to the Ameriprise brokerage account (and only the brokerage account).[6] Mr. Bayles checked a box designating as the beneficiaries of the brokerage account his "Living Lawful Children, Equality [sic] With Rights of Survivorship." Below the box checked by Mr. Bayles, the form defines the beneficiaries as "[t]he living lawful children of the owner and they will receive equal shares of the proceeds[.]"

In sum, after completing the portfolio account application and the change of beneficiary form on September 5, 2012, it appears that Mr. Bayles intended, upon his death: (1) for the money in the brokerage account to go to his children, defendants Kristina Nicholls and Stephen Bayles; and (2) for the money in the portfolio account to go to his wife, plaintiff Debra Bayles.

---

[5] The second document completed and signed by Mr. Bayles was titled "IRA Designation of Beneficiary for IRAs held by Ameriprise Trust Company as Custodian."

[6] The designation of beneficiary form identifies only the brokerage account, "IRA ACCT # 7465 9264 1133," as the account affected by the change of beneficiaries. Nowhere on the form is the portfolio account (with the account number 8362 0961 9133) listed.

Unfortunately, in a letter dated September 24, 2012, Ameriprise informed Mr. Bayles that it had removed the plaintiff as beneficiary from *both* the brokerage *and* the portfolio accounts. The letter indicates that Ameriprise had substituted Mr. Bayles's children as the sole beneficiaries.[7] The letter asked Mr. Bayles to "review the information . . . to see if any action is required." Mr. Bayles did not respond to the letter, and he gave a copy of the letter to his daughter Kristina.

Mr. Bayles died on March 26, 2013, at the age of 64.

The record indicates that, the day before Mr. Bayles died, Evans informed Mr. Bayles's children that they were the beneficiaries of both Ameriprise accounts. Conversely, when the plaintiff called after her husband's death and asked about the status

---

[7] The September 24, 2012, letter from Ameriprise to Mr. Bayles lists the following beneficiary designation:

PRIMARY BENEFICIARY

LIVING, LAWFUL CHILDREN IN EQUAL SHARES
100.00%

This designation is in effect for the following account(s):

AMERIPRISE BROKERAGE 0000 0000 7465 9264 1 133
ACTIVE PORTFOLIOS 0000 0000 8362 0961 9 133

6

of the Ameriprise accounts,[8] Evans told her "if she had been the beneficiary she would have been notified by now" and said he could give her no more information.

Apparently unknown to both the plaintiff and Mr. Bayles's children, upon Mr. Bayles's death, Ameriprise began investigating the discrepancy between the September 5, 2012, portfolio account application (listing the plaintiff as the sole beneficiary) and the September 24, 2012, letter (listing Mr. Bayles's children as the beneficiaries of the portfolio account). Ameriprise employees recognized that the plaintiff and the children were "so combative we don't know what they would be willing to do," and decided that "the bottom line is – if they don't know about this situation, who knows how they would react[.]" Ameriprise later decided to pay the benefits from both accounts solely to Mr. Bayles's children.[9]

---

[8] The plaintiff (Mrs. Bayles) testified in her deposition that she first learned that her husband had multiple accounts with Ameriprise shortly before his death, while family members gathered around Mr. Bayles in his hospital room.

[9] In e-mails exchanged by Ameriprise employees, Ameriprise suggested a bureaucratic error had occurred because the brokerage and portfolio accounts "are both in the same PLAN and plan beneficiaries are recorded the same." The employees surmised there was a different beneficiary form that should have been used to "separate accounts into different plans that will allow different beneficiaries," but because that form was not used, the company assumed Mr. Bayles was "ok" with making his children the sole beneficiaries of both accounts. Ameriprise employees seemed determined to conceal the discrepancy because, if they paid the portfolio account to Mrs. Bayles rather than the children, "they could come back and sue us and we risk having to pay it out twice." One Ameriprise employee explored getting Mrs. Bayles and the children to agree to split the accounts, but another Ameriprise employee was certain that would not happen because, "They were actually fighting at the funeral, unfortunately."

7

On September 5, 2014, plaintiff Debra Bayles filed this lawsuit asserting she was entitled to the benefits from both the brokerage and portfolio accounts. Her complaint specifically referred to the contracts Mr. Bayles had signed with Ameriprise, and she sought damages including the "benefits due under said contract[s.]" She sued defendants Jeffrey Evans and Ameriprise for negligence, breach of contract and detrimental reliance. The plaintiff also sued her husband's children (defendants Kristina Nicholls and Stephen Bayles) and alleged they were unjustly enriched by Ameriprise's wrongful disbursement of both accounts.

The defendants promptly moved to dismiss the lawsuit. Citing to the arbitration clauses in both the brokerage and portfolio applications, the defendants sought an order to compel the plaintiff to arbitrate her claims. On May 19, 2015, the circuit court entered an order that denied the motion and finding "as a matter of law that the decedent [Mr. Bayles] did not enter into a valid arbitration agreement with Ameriprise[.]" The defendants appealed that order to this Court, and we reversed. In our opinion, we concluded that there *was* an arbitration agreement; however, we also found unresolved issues in the record regarding the enforceability of that agreement, including the plaintiff's assertion that the agreement was unconscionable. *Evans v. Bayles*, 237 W. Va. 269, 274, 787 S.E.2d 540, 545 (2016). We remanded the case to the circuit court for additional review.

On June 14, 2016 (two weeks after this Court issued its opinion), plaintiff Bayles filed a motion to amend her complaint, and the circuit court granted the motion.

8

The amended complaint alleged fraud by defendants Ameriprise and Evans. Specifically, the plaintiff asserted that Evans "fraudulently induced Plaintiff . . . to sign a consent" to roll over assets from her husband's 401(k) plan to the Ameriprise brokerage account. The plaintiff contended that Evans's statements were fraudulent and material, particularly because he assured the plaintiff that "her beneficiary status could not be changed in the future without her consent, which is a false statement." She also alleged that Evans's fraudulent statements caused the funds from both the brokerage and portfolio accounts to be "wrongfully distributed" to the decedent's children, defendants Kristina Nicholls and Stephen Bayles.

The defendants replied to the amended complaint with another motion to dismiss, as well as another request that the circuit court compel the plaintiff to arbitrate all her claims. The plaintiff responded that the Ameriprise arbitration clauses did not apply to her, because she never signed the brokerage or portfolio account contracts. Further, she argued she never assented to any of the terms of the contracts, and never received any consideration. She also reiterated her contention that the arbitration clauses were unconscionable and unenforceable. The circuit court thereafter permitted the parties to conduct discovery on the enforceability of the arbitration clauses in the brokerage and portfolio accounts.

On September 15, 2018, the circuit court entered an order granting the defendants' motion to dismiss the plaintiff's lawsuit and compelling the plaintiff to arbitrate her claims. The circuit court found the arbitration clauses in both the brokerage

9

and portfolio account agreements to be valid and enforceable. The circuit court also found the plaintiff's claims for the assets of both accounts to be within the substantive scope of the arbitration clauses. Accordingly, the circuit court ordered that the plaintiff arbitrate her claims according to the terms of the arbitration clauses in the account agreements.

Plaintiff Bayles now appeals those parts of the circuit court's September 15, 2018, order that dismissed her complaint and compel her to arbitrate. The defendants also appeal several surplus statements made by the circuit court in its order, statements we discuss later in this opinion.

## II. Standard of Review

"Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo*." Syllabus Point 2, *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 461 S.E.2d 516 (1995).

## III. Discussion

When a party to an arbitration agreement makes a motion to dismiss a complaint and to compel arbitration, the power of the trial court to proceed in the case is constrained. "In the context of cases affected by the Federal Arbitration Act, we have found that courts are limited to weighing only two questions: does a valid arbitration agreement exist? And do the claims at issue in the case fall within the scope of the arbitration agreement?" *Golden Eagle Res., II, L.L.C. v. Willow Run Energy, L.L.C.*, 836

S.E.2d 23, 29 (W. Va. 2019). As we stated in Syllabus Point 2 of *State ex rel. TD Ameritrade, Inc. v. Kaufman*, 225 W. Va. 250, 251, 692 S.E.2d 293, 294 (2010):

> When a trial court is required to rule upon a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–307 (2006), the authority of the trial court is limited to determining the threshold issues of (1) whether a valid arbitration agreement exists between the parties; and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement.

We similarly confine our de novo review of the parties' arguments to considering whether there is a valid, enforceable arbitration agreement, and whether the claims asserted by plaintiff Bayles fall within the substantive scope of the agreement. We first consider the appeal by plaintiff Bayles, and then examine the appeal by the defendants.

## A. The Appeal by Plaintiff Bayles

Plaintiff Bayles contends that she is the rightful beneficiary of both Ameriprise accounts. She raises three arguments why the circuit court erred in dismissing her complaint and forcing her to arbitrate her claim to those accounts. Two of her arguments concern the enforceability of the arbitration agreements within the applications for the accounts, while the third regards whether the parties' dispute falls within the scope of the arbitration agreements. First, she argues that she was not a signatory to any arbitration agreement: because only her deceased husband agreed to arbitrate disputes regarding the accounts, the plaintiff asserts she is not bound by the terms of the arbitration agreements. Second, the plaintiff contends that Evans and Ameritrade made fraudulent claims that induced her to consent to the placement of money from her husband's 401(k)

11

plan into the brokerage and portfolio accounts. Third, and finally, the plaintiff argues that if the arbitration agreements are valid and enforceable, then her claims fall outside the scope of those agreements. We examine these arguments in turn.

### 1. *Compelling a nonsignatory to arbitrate*

The plaintiff's first and most substantial argument is that the circuit court erred in finding a valid, enforceable arbitration agreement existed between the parties, because the plaintiff did not sign any documents containing an arbitration agreement. The record shows that the decedent, Mr. Bayles, signed one application to create the brokerage account and another application to create the portfolio account. Both of those applications created contracts that incorporated arbitration agreements. The record is also clear that the plaintiff did not sign either of those applications and their incorporated arbitration agreements. The plaintiff reasons that, since she did not assent to those arbitration agreements, she cannot be bound by them.

It is well settled that arbitration is a matter of contract. Therefore, as a general rule, only signatories to an arbitration agreement will be required to submit to arbitration. As the plaintiff argues, it is a central rule of contract law is that "[a] party generally cannot be forced to participate in an arbitration proceeding unless the party has, in some way, agreed to participate." *Chesapeake Appalachia, L.L.C. v. Hickman*, 236 W. Va. 421, 439, 781 S.E.2d 198, 216 (2015). Stated another way, "Third persons who are not parties to an arbitration agreement generally are not bound by the agreement or any resulting award." Richard A. Lord, 21 Williston on Contracts § 57:19 (4th ed. 2019).

12

That rule is not inflexible and is subject to traditional principles of contract and agency law. Hence, we have stated that "[a] court may not direct a nonsignatory to an agreement containing an arbitration clause to participate in an arbitration proceeding absent evidence that would justify consideration of whether *the nonsignatory exception[s] to the rule* requiring express assent to arbitration should be invoked." Syllabus Point 3, *State ex rel. United Asphalt Suppliers, Inc. v. Sanders,* 204 W.Va. 23, 511 S.E.2d 134 (1998) (emphasis added).

"Well-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416-17 (4th Cir. 2000). In *Chesapeake Appalachia*, we recognized several common law principles in which a signatory to an arbitration agreement can, in very limited circumstances, require a nonsignatory to comply with the agreement. As we stated in Syllabus Point 10 of *Chesapeake Appalachia*:

> A signatory to an arbitration agreement cannot require a non-signatory to arbitrate unless the non-signatory is bound under some traditional theory of contract and agency law. The five traditional theories under which a signatory to an arbitration agreement may bind a non-signatory are: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.

*Chesapeake Appalachia*, 236 W. Va. at 426, 781 S.E.2d at 203. *See also* 21 Williston on Contracts § 57:19 ("traditional principles of state law allow a contract to be enforced . . . against nonparties to the contract through assumption, piercing the corporate veil, alter ego,

13

incorporation by reference, third party beneficiary theories, waiver, and estoppel."). We cautioned that courts asked to apply these theories "should be wary of imposing a contractual obligation to arbitrate on a non-contracting party." *Id.* at 440, 781 S.E.2d at 217 (quoting *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 97 (2d Cir. 1999)). Put simply, "a non-signatory cannot be bound to arbitrate unless it is bound 'under traditional principles of contract and agency law' to be akin to a signatory of the underlying agreement." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001).

Defendants rely upon the fifth theory listed in *Chesapeake Appalachia*: estoppel. They contend that the plaintiff is equitably estopped from avoiding arbitration because she claims, as a beneficiary, that she is entitled to a direct benefit from the contracts that her deceased husband signed with Ameriprise. Because Mr. Bayles agreed to arbitrate any disputes regarding those contract benefits, the defendants assert the plaintiff should likewise be required to arbitrate her claim to those benefits. We agree.

Syllabus Point 10 of *Chesapeake Appalachia* recognizes that a signatory to an arbitration agreement has standing to compel a nonsignatory to participate in arbitration based upon the principle of equitable estoppel.[10] The inquiry into whether estoppel applies

---

[10] In *Shelton v. Johnston*, 82 W. Va. 319, ____, 95 S.E. 958, 959 (1918), the Court offered the following definition of "equitable estoppel":

Continued . . .

14

is fact specific, but essentially involves a review of "the relationships of persons, wrongs and issues, in particular whether the claims . . . [asserted are] intimately founded in and intertwined with the underlying contract obligations." *Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403, 406 (2d Cir. 2001) (cleaned up). *See also*, *EPIX Holdings Corp. v. Marsh & McLennan Companies, Inc.*, 410 N.J. Super. 453, 463, 982 A.2d 1194, 1200 (App. Div. 2009) ("The estoppel inquiry . . . usually involves an analysis of the connection between the claim, the arbitration agreement and the parties.").[11] As with

---

The doctrine of equitable estoppel, as stated by Lord Denman, in *Pickard v. Sears*, 6 Adolph. & El. 469, has been generally adopted in both English and American courts, as follows:

> "Where one by his words or conduct willfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time." *Preston v. Mann*, 25 Conn. 118, 128.

The word "wilfully" as the authorities hold is not to be taken in the limited sense of the term "maliciously" or "fraudulently," nor does it imply a desire to produce a wrong impression or to produce a particular line of conduct. Regardless of the motive if the natural consequences of one's words, acts, or conduct will be to influence another to change his condition, and to act upon that belief to his prejudice, the result will be to estop the one responsible for setting up a contrary state of facts.

[11] This analysis is particularly important when a nonsignatory asks a court to compel a signatory to arbitrate. As this Court stated in Syllabus Point 4 of *Bluestem Brands, Inc. v. Shade*, 239 W. Va. 694, 805 S.E.2d 805 (2017):

Continued . . .

any of the contract and agency theories expressed in *Chesapeake Appalachia*, "[t]he doctrine of estoppel should be applied cautiously and only when equity clearly requires it to be done." Syllabus Point 3, *Humble Oil & Ref. Co. v. Lane*, 152 W. Va. 578, 165 S.E.2d 379 (1969). Accord, Syllabus Point 7, *Samsell v. State Line Dev. Co.*, 154 W. Va. 48, 174 S.E.2d 318 (1970) ("The doctrine of estoppel should be applied cautiously, only when equity clearly requires that it be done[.]"). "The doctrine of equitable estoppel is applied only in very compelling circumstances, where the interests of justice, morality and common fairness clearly dictate that course." *IBS Fin. Corp. v. Seidman & Assocs., L.L.C.*, 136 F.3d 940, 948 (3d Cir. 1998) (cleaned up).

As a general rule, the doctrine of equitable estoppel allows a court to prevent a nonsignatory from embracing a contract, but then turning his, her, or its back on the portions of the contract (such as an arbitration clause) that the nonsignatory finds "distasteful." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001). One court explained the doctrine this way:

> In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that

---

A non-signatory to a written agreement requiring arbitration may utilize the estoppel theory to compel arbitration against an unwilling signatory when the signatory's claims make reference to, presume the existence of, or otherwise rely on the written agreement. Such claims sufficiently arise out of and relate to the written agreement as to require arbitration.

16

other provisions of the same contract should be enforced to benefit him. To allow [a nonsignatory] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the [Federal] Arbitration Act.

*International Paper Co.*, 206 F.3d at 418 (cleaned up). In summarizing the doctrine, the seminal treatise *Williston on Contracts* declares that "[a] nonsignatory may not cherry-pick beneficial contract terms while ignoring other provisions that do not benefit it or that it would prefer not to be governed by such as an arbitration clause."[12] 21 Williston on Contracts § 57:19. *See also Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 85 (3d Cir. 2010) (Estoppel "prevents a non-signatory from 'cherry-picking' the provisions of a contract that it will benefit from and ignoring other provisions that don't benefit it or that it would prefer not to be governed by (such as an arbitration clause)."). Stated simply, a nonsignatory who seeks to reap the benefits of a contract must bear its burdens as well.

Another way to examine the application of estoppel is to consider whether the nonsignatory has received a "direct benefit" from the contract, parts of which the nonsignatory later tries to disavow. Courts often say that a nonsignatory is estopped from refusing to comply with an arbitration clause "when it receives a 'direct benefit' from a contract containing an arbitration clause." *International Paper Co.*, 206 F.3d at 418

---

[12] To be clear, a nonsignatory may bind a signatory to the terms of a contract provision as well. "A signatory also cannot have it both ways. It cannot seek to hold the nonsignatory liable pursuant to duties imposed an agreement, which contains an arbitration provision, but deny the arbitration provision's applicability because the defendant is a nonsignatory." 21 Williston on Contracts § 57:19; *see also*, Syllabus Point 4, *Bluestem Brands, Inc. v. Shade*, 239 W. Va. at 694, 805 S.E.2d at 805.

17

(quoting *American Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir. 1999)). "Direct-benefit estoppel involve[s] non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Hellenic Inv. Fund, Inc. v. Det Norske Veritas,* 464 F.3d 514, 517-18 (5th Cir. 2006). "A non-signatory can 'embrace' a contract containing an arbitration clause in two ways: (1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract." *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010). When the nonsignatory knowingly exploits the contract containing the arbitration clause and obtains a direct benefit from that contract, "[c]ourts have applied direct benefits estoppel to bind a non-signatory to an arbitration agreement[.]" *Id.*

In the instant case, the plaintiff is seeking the direct benefits of the contracts signed by her husband, despite not being a signatory to either contract. The plaintiff is seeking to recover the assets that her deceased husband deposited with Ameriprise under the brokerage contract and is seeking to enforce her understanding of the contract: that her husband's initial choice of beneficiary could never be changed. The plaintiff also wants to enforce the terms of the portfolio contract, because her deceased husband appears to have named her as the beneficiary of the portfolio account. Despite her attempts to recover the benefits of the contracts, the plaintiff is "cherry-picking" the terms beneficial to her while disavowing the terms she would prefer not to be governed by, namely the arbitration

18

clauses in both contracts. Under these facts, the circuit court was within its discretion to find the plaintiff bound by all the terms of the contracts, including the arbitration clauses.

Accordingly, despite the plaintiff not being a signatory to either the brokerage or portfolio applications, the equitable doctrine of estoppel compels the plaintiff to arbitrate her claim to benefits from both contracts formed when her husband signed those applications. We, therefore, find no error in the circuit court order dismissing the plaintiff's complaint and compelling her to arbitration.[13]

## 2. *Plaintiff's claims of fraud*

The plaintiff's second argument is that any agreement that purports to exist between her and the defendants is a byproduct of fraud or constructive fraud. The plaintiff correctly notes that "[n]othing in the Federal Arbitration Act, 9 U.S.C. § 2, overrides normal rules of contract interpretation. Generally applicable contract defenses—such as laches, estoppel, waiver, *fraud*, duress, or unconscionability—may be applied to invalidate an arbitration agreement." Syllabus Point 9, *Brown ex rel. Brown v. Genesis Healthcare Corp.*, 228 W. Va. 646, 724 S.E.2d 250 (2011), *cert. granted, judgment vacated sub*

---

[13] The plaintiff also complains that it is unfair that her husband's children (defendants Kristina Nicholls and Stephen Bayles) are being compelled to arbitrate, because they too never signed any arbitration agreement. We reject this general argument because these defendants are in the same position as the plaintiff: their claim to any benefits from defendants Ameriprise and Evans is founded exclusively on the brokerage and portfolio contracts signed by their father. Moreover, the children have, throughout this litigation, consented to have their defense arbitrated with Ameriprise and Evans.

19

*nom. Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530 (2012) ("*Brown I*") (emphasis added).[14]

The plaintiff asserts that her husband could not have moved the money out of his 401(k) plan (where federal law guaranteed her a survivor's benefit) and into the Ameriprise brokerage account without receiving her consent. She further asserts that defendant Evans made misleading or fraudulent statements that induced her to consent to the transfer of money to the Ameriprise brokerage account. The plaintiff contends that, but for Evans's misstatements, her husband never could have entered into the brokerage contract, and hence, any arbitration clause in that contract must be invalidated as a direct byproduct of fraud, constructive fraud and/or material misrepresentation. In sum, the plaintiff asserts the circuit court erred in finding the arbitration clauses were not void or unenforceable because of the defendants' fraud.

We reject the plaintiff's argument because, unfortunately, her approach violates a basic rule of federal arbitration law: the doctrine of severability. The doctrine requires a party resisting arbitration to exclusively challenge the enforceability of the arbitration clause, and not the overall contract:

> When a lawsuit is filed implicating an arbitration agreement, and a party to the agreement seeks to resist

---

[14] "To be clear, this list is not exclusive. Misrepresentation, duress, mutuality of assent, undue influence, or lack of capacity, if the contract defense exists under general common law principles, then it may be asserted to counter the claim that a . . . provision binds the parties. Even lack of consideration is a defense." *Geological Assessment & Leasing v. O'Hara*, 236 W. Va. 381, 387, 780 S.E.2d 647, 653 (2015) (citation omitted).

arbitration, the Supreme Court has interpreted the FAA to require application of the doctrine of "severability" or "separability." The gist of the doctrine is that an arbitration clause in a larger contract must be carved out, severed from the larger contract, and examined separately. The doctrine treats the arbitration clause as if it is a separate contract from the contract containing the arbitration clause, that is, the "container contract." Under the doctrine, arbitration clauses must be severed from the remainder of a contract, and must be tested separately under state contract law for validity and enforceability.

*Schumacher Homes of Circleville, Inc. v. Spencer*, 237 W. Va. 379, 387-88, 787 S.E.2d 650, 658-59 (2016) (quotes and footnotes omitted). In Syllabus Point 4 of *State ex rel. Richmond Am. Homes of W. Virginia, Inc. v. Sanders*, 228 W. Va. 125, 129, 717 S.E.2d 909, 913 (2011), we said in part:

Under the Federal Arbitration Act, 9 U.S.C. § 2, and the doctrine of severability, only if a party to a contract explicitly challenges the enforceability of an arbitration clause within the contract, as opposed to generally challenging the contract as a whole, is a trial court permitted to consider the challenge to the arbitration clause.

When the United States Supreme Court first adopted the severability doctrine, it did so in a case with an argument like that posed by the plaintiff. In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403 (1967), Prima Paint signed a contract with Flood & Conklin. Shortly after performance of the contract began, Prima Paint discovered Flood & Conklin was insolvent and unable to perform. Prima Paint then sued seeking to rescind the entire contract on the ground it had been misled and fraudulently induced to sign.

21

The *Prima Paint* contract contained an arbitration clause. The Supreme Court concluded that under Section 2 of the Federal Arbitration Act, courts should presume an arbitration clause is "valid, irrevocable, and enforceable" until proven otherwise. *See* 9 U.S.C. § 2.

> Accordingly, if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally. . . . [A] federal court may consider only issues relating to the making and performance of the agreement to arbitrate.

*Prima Paint*, 388 U.S. at 403-04. Stated simply, the severability doctrine adopted in *Prima Paint* stands for the principle that when a party raises claims of fraud, those claims must be directed solely to the making and performance of the agreement to arbitrate. Claims of fraud in the inducement of the contract in general must be resolved by an arbitrator. Because Prima Paint sued to rescind the entire contract, the Supreme Court presumed the arbitration agreement was valid and enforceable. Prima Paint was, therefore, compelled to arbitrate its fraudulent inducement claim.

In the instant case, the plaintiff did not argue to the circuit court that the arbitration agreement was procured by fraud. Instead, she asserted that the entire contractual relationship between her deceased husband, on the one hand, and Ameriprise and Evans on the other, was induced by fraud. The plaintiff argued that if she had not been misled or defrauded by Evans, no contractual relationship would have been formed with Ameriprise – and therefore, there would be no arbitration agreement.

22

Because the plaintiff's claims of fraud go to the overall existence of a contract, we are required – because of the doctrine of severability – to presume that a valid arbitration agreement was formed by the parties. Accordingly, the question of fraud posed by the plaintiff must be weighed by the arbitrator. Therefore, we find no error by the circuit court on this point.

### 3. *The scope of the arbitration clauses*

As we noted earlier, Syllabus Point 2 of *State ex rel. TD Ameritrade, Inc. v. Kaufman* requires a court to consider "whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement." 225 W. Va. at 251, 692 S.E.2d at 294.

The plaintiff contends that her claims of "fraud, misrepresentation, detrimental reliance, etc." are her own separate, distinct claims and do not arise out of the Ameriprise brokerage and portfolio accounts. Basically, she asserts she had a vested right in her husband's 401(k) account but defendant Evans induced her, through false representations and to her detriment, to consent to allow money to be removed from the 401(k) and be transferred to the Ameriprise accounts. Hence, the plaintiff argues that her fraud-type claims do not fall within the substantive scope of the arbitration clauses.

We reject the plaintiff's argument because we perceive that the fraud-type claims, as they are asserted by the plaintiff in her amended complaint, are inexorably intertwined with the Ameriprise accounts. The plaintiff's amended complaint specifically

23

alleges she was induced by fraudulent statements from defendant Evans that the plaintiff's beneficiary status *on the brokerage account* "could not be changed in the future without her consent[.]" The plaintiff's amended complaint also alleges that the fraudulent statements caused the funds from both the brokerage and portfolio accounts to be "wrongfully distributed" to the decedent's children, defendants Kristina Nicholls and Stephen Bayles. Moreover, the plaintiff's amended complaint sought damages including the "benefits due under said contract[s.]"

As the plaintiff pleaded her amended complaint, the record supports the circuit court's finding that the plaintiff's claims were entirely within the scope of the Ameriprise arbitration clauses. The plaintiff's claims pursue relief related, directly and indirectly, to the brokerage and portfolio account contracts. The claims seek to enforce terms of the account contracts – mainly, to compel Ameriprise to comply with her interpretation of Mr. Bayles's contractual choice of beneficiary, and to compel the disbursement of the proceeds in the accounts to her.

On this record, we find no error by the circuit court.[15]

---

[15] The plaintiff also asserts that the circuit court erred in finding that the arbitration agreements were not unconscionable. We have reviewed the record and find no error by the circuit court.

24

## B. The Appeal by the Defendants

The defendants also appeal the circuit court's September 15, 2018, order, and assert the existence of two errors in surplus language contained in the order.

First, the defendants contend that the circuit court interpreted the record and made two different findings on the merits of plaintiff's claims, and thereby invaded the province of the arbitrator. The circuit court found that "on the date of Mr. Bayles' passing the sole beneficiary of the *Portfolios Account* was his wife, Plaintiff Debra K. Bayles." The circuit court also found that "the 'beneficiary confirmation letter' dated September 24, 2012, **DID NOTHING** to modify or otherwise affect the designation of Plaintiff Debra K. Bayles as the sole beneficiary of the *Portfolio Account* or the assets therein." The defendants ask this Court to reverse these findings by the circuit court and to order that the plaintiff's claims be arbitrated pursuant to the terms of the arbitration agreements.

Federal court cases make clear that the Federal Arbitration Act prohibits trial courts from delving into the merits of a dispute when examining the question of whether arbitration is required. As we said in *TD Ameritrade*:

> The law is well-settled "that, in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Discussing the general rule that courts are to decide the threshold issue of arbitrability (i.e. whether there is an enforceable agreement to arbitrate), the United States Supreme Court recognized the limited nature of that initial determination: "'The courts, therefore, have no business weighing the merits of the grievance, considering whether

25

there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.'"  475 U.S. at 650, 106 S.Ct. 1415 (quoting *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)).

225 W. Va. at 253-54, 692 S.E.2d at 296-97.

In the instant case, once the defendants demanded arbitration pursuant to the agreements, the circuit court's authority was limited to determining whether a valid, enforceable arbitration agreement existed between the parties, and whether the parties' dispute was within the substantive scope of the agreement.  The circuit court was proscribed from ruling on the potential merits of the plaintiff's underlying claims.  Accordingly, when the circuit court ruled that the plaintiff was the sole beneficiary of the portfolios account and made rulings regarding the impact of the September 2012 beneficiary letter sent to Mr. Bayles, the circuit court exceeded its authority.  To the extent the circuit court's order ruled on the factual merits of the plaintiff's claims, the order must be reversed.

The defendants also challenge a surplus statement by the circuit court in its order.  The circuit court declared in its dismissal order: "What, if any, causes of action Plaintiff Debra K. Bayles[] has or may assert against Defendants relative to fraud or concealment <u>following</u> the passing of William N. Bayles are not the subject of this dismissal."  The defendants assert the plaintiff never alleged that the defendants committed fraud after the death of the decedent.  We agree.

We have examined the plaintiff's amended complaint and can find no allegation of fraud or concealment by the defendants that occurred after the March 26, 2013, death of Mr. Bayles. In doing so, we have construed the amended complaint in the light most favorable to the plaintiff and taken its allegations as true. *See John W. Lodge Distrib. Co. v. Texaco, Inc.*, 161 W. Va. 603, 605, 245 S.E.2d 157, 158 (1978) ("For purposes of the motion to dismiss, the complaint is construed in the light most favorable to plaintiff, and its allegations are to be taken as true."). Moreover, the allegations of fraud, concealment or misrepresentation in the complaint are intrinsically connected to the contracts signed by Mr. Bayles and are, therefore, subject to arbitration. Accordingly, to the extent the circuit court's order professes to permit the plaintiff to pursue a cause of action that the plaintiff never alleged, the order was in error and the language has no effect.

## IV. Conclusion

The circuit court's September 15, 2018, order properly found that the arbitration agreements incorporated into the Ameriprise contracts were enforceable. Moreover, the circuit court's order properly determined that the parties' dispute was within the scope of the arbitration agreements. Accordingly, the circuit court's decision to dismiss the plaintiff's amended complaint and to compel her to arbitrate her claims is affirmed.

However, the circuit court erred in including improper language in its order (language that ruled on the factual merits of the plaintiff's claims, and which permitted the plaintiff to pursue fraud claims never alleged in her amended complaint). To the extent the circuit court included this surplus language, the order is reversed. The circuit court's

dismissal order otherwise stands and, as no other issues remain for disposition, no remand is necessary.  The parties must arbitrate their dispute.

Affirmed, in part, Reversed, in part.